ROBERT N. NOYCE AND ANN S. BOWERS NOYCE, PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 21094-88.　　　Filed December 16, 1991.

---

*Lawrence A. Aufmuth* and *Thomas J. Morgan,* for the petitioners.

*Robert J. Misey, Jr.,* for the respondent.

RUWE, *Judge:* Respondent determined a deficiency in petitioners' Federal income taxes for 1983 in the amount of $68,633.50. The issues for decision are: (1) Whether petitioners may deduct operating expenses and depreciation with respect to use of an airplane by Mr. Noyce in his capacity as a corporate official; (2) whether petitioners are entitled to deduct the airplane expenses and depreciation with respect to its use for Mr. Noyce's flight training; (3) whether petitioners are entitled to deduct expenses and depreciation for flight time related to airplane maintenance; (4) what is the total allowable amount of deductible expense and depreciation on the airplane for 1983; and (5) whether petitioners are entitled to an investment tax credit for the airplane.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein.

Petitioners, Robert N. Noyce and Ann S. Bowers Noyce, are husband and wife. They timely filed a joint income tax return for the year 1983. In 1983, petitioners had legal residence at Los Altos, California. At the time they filed their petition in this case, they were residents of Austin, Texas.

On their 1983 return, petitioners claimed deductions for depreciation, management fees, fixed expenses, and operating expenses attributable to a Cessna Citation airplane (the airplane) as follows:

| | |
|---|---|
| Depreciation | $112,463 |
| Management fees | 2,880 |
| Fixed expenses | 7,043 |
| Operating expenses | 16,983 |
| | 139,369 |

Petitioners also claimed an investment tax credit for the airplane in the amount of $12,500.

On June 23, 1988, respondent mailed a notice of deficiency for the year 1983. Respondent determined a defi-

ciency in the amount of $68,633.50 as the result of disallowing all but $9,647 of depreciation and $3,348 of the other fixed and operating expenses deducted. Respondent also disallowed $5,444 of the investment tax credit claimed by petitioners.

All references to petitioner in the singular are to Robert N. Noyce.

*Petitioner's Background*

Petitioner was graduated from Grinnell College in 1949 with a B.A. in physics and mathematics. Petitioner was later graduated from the Massachusetts Institute of Technology in 1953 with a Ph.D. in physics. From 1956 to 1957, petitioner worked with William Shockley, the inventor of the transistor and the recipient of the Nobel Prize in physics, at the Shockley Semiconductor Laboratory in Mountain View, California. In 1957, petitioner cofounded Fairchild Semiconductor, a pioneer corporation in the semiconductor industry.

In 1968, petitioner cofounded Intel Corp. (Intel) with Drs. Gordon Moore and Andrew Grove with whom he had worked previously at Fairchild. Upon the formation of Intel, petitioner became the chief executive officer and served in that capacity until 1974 when he became the chairman of the board. In 1979, petitioner became vice chairman of the board and served in that capacity throughout 1983.

*Intel Corporation*

Intel was formed as a manufacturer of integrated circuits on silicon chips. Intel's business currently focuses on microcomputers, consisting of both silicon chips and microcomputing systems which are typified by the personal computer.

Intel operates primarily in the Western United States, the Far East, Asia, and Europe. In 1983, it had manufacturing facilities in Hillsboro, Oregon, located outside Portland, Oregon, and in Albuquerque, New Mexico. Intel generated approximately $1 billion in revenues and employed approximately 7,000 people worldwide in 1983. By June 1989, it generated approximately $3 billion in revenues and employed about 20,000 people worldwide.

Intel has developed and fostered the "Intel Culture." This culture consists of a relatively distinctive operating style, management philosophy, and compensation policy. The Intel culture is summarized by an egalitarian approach to employees where everyone is treated alike in all respects except compensation. The company's open-office concept epitomizes this egalitarian style—there is no executive dining room and there are no private offices or reserved parking spaces for anyone.

Drs. Moore and Grove, who were the chairman of the board and the president, respectively in 1983, set the salaries for all of the Intel officers, including petitioner. During some years, petitioner had asked that his salary as determined by Drs. Moore and Grove be reduced. As a result, petitioner was probably earning less than one-half of the market rate for his position. Petitioner received $105,076 compensation from Intel in 1983.

Petitioner had invested $250,000 in Intel upon its founding. By 1983, petitioner's Intel holdings were worth over $60 million. This represented less than 3 percent of the outstanding Intel stock at that time. Petitioner sold approximately $5 million of Intel stock in 1983.

Petitioner also frequently invested in startup high-technology companies acquiring low basis stock which he disposed of after it appreciated over time. As a result of his investments in high technology and startup companies in 1983, petitioner served as a board member for three of the companies and as chairman of the board for two others. He attended board meetings regularly, consulted with the officers, and reviewed engineering designs.

Over the years, petitioner's role at Intel emerged as that of the company's public representative. During 1983, petitioner fulfilled the function of being Intel's representative to its outside constituencies. Petitioner often "opened doors" to various corporate customers, and for certain major customers of Intel, petitioner's liaison role was crucial.

As vice chairman, petitioner was the governmental affairs liaison and responsible for Intel's public relations. His duties included accepting speaking engagements throughout the United States, performing various governmental and public-service duties, serving as the chairman of the Semi-

conductor Industry Association, serving as a member of various trade associations of the semiconductor industry, and serving as a member of the Presidential Commission on Industrial Competitiveness (the Young Commission). Petitioner was also expected to attend numerous onsite meetings at Intel.

Petitioner also served as a regent of the University of California and as a trustee of Grinnell College during 1983. Petitioner attended Grinnell Board of Trustee meetings as part of his general networking in the educational community and because Grinnell was an Intel stockholder. When petitioner formed Intel in 1968, Grinnell College and two of the Grinnell College trustees each contributed $100,000 to the startup of Intel. The two trustees subsequently contributed their Intel shares to Grinnell College. Service on Grinnell's board offered petitioner an opportunity to compare his views on trade and competition with other individuals involved in banking, economics, and other areas. Petitioner's service as a University of California Regent allowed him to network with people of significance in commerce, education, science, and Government. The Board of Regents is charged with all business aspects of the University of California, including being the final overseer of the energy laboratories in Los Alamos, Livermore, and Berkeley. As part of petitioner's duties as an official of Intel, petitioner was expected to serve on the Grinnell and University of California boards. Such service was an essential part of networking for the benefit of Intel and provided an opportunity to gain access to people to test and develop ideas on trade and international competition.

In addition to the Board of Regents at the University of California and the Board of Trustees at Grinnell College, petitioner served on the Engineering Advisory Board at Stanford, the Applied Physics Advisory Board at Harvard, and the Electrical Engineering Advisory Board at MIT. Petitioner was also president and chief executive officer of the Semiconductor-Industry Cooperative Consortium, Sematech, whose members include IBM, AT&T, Digital Equipment Corp., Hewlett-Packard, Texas Instruments, Motorola, National Semiconductor, Intel, Advanced Micro Devices, and Rockwell Corp. Petitioner has been awarded 16

patents, including the patent for the first application of the use of a silicon chip for integrated circuits. He was a recipient of the National Medal of Science and the National Medal of Technology and has been inducted into the National Inventors Hall of Fame and the National Business Hall of Fame.

Petitioner's duties as vice chairman required frequent and extensive travel, some of which was not regularly and easily scheduled. Because of the changing schedules of people with whom petitioner was expected to meet, he was expected to keep a flexible travel schedule.

## The Cessna Citation Airplane

On April 27, 1983, petitioner purchased a used aircraft, a Cessna Citation M2617U, for $1,260,000 and took delivery in Wichita, Kansas. Petitioner paid cash for the airplane. Since its purchase in 1983, the airplane has not depreciated in economic value. At the time of trial, the bluebook value of the airplane was $1,300,000.[1]

The Cessna Citation M2617U airplane is a twin-turbo jet which has two pilot positions, seats up to six passengers, cruises at 340 knots, and has a range of approximately 1,100 nautical miles. Most turbo jets used in commercial airline travel have a longer range and fly approximately one-third faster. However, the airplane's flying time is comparable to nonstop commercial flights and superior if the commercial flights are not nonstop. The airplane is capable of landing on a 2,800-foot runway, which is within the length of runways at most small town airports. By contrast, commercial airliners need 5,000-6,000-foot runways and, therefore, are limited in the cities they can service.

Petitioner was a licensed pilot. He obtained his first pilot rating in 1969. Petitioner attained and maintained various pilot ratings including a single-engine seaplane rating, a multi-engine land rating, a commercial pilot rating, an instrument rating, and an airline transport pilot rating. In order to attain and maintain these ratings, petitioner was required to be familiar with the FAA rules regarding pilot training, equipment required on various airplanes for vari-

---

[1]Because the airplane had a relatively low amount of flying time, it was worth more than its bluebook value. Prior to trial, petitioner had been offered $1,600,000 for the airplane.

ous ratings, and maintenance required of airplanes used in the charter business. FAA regulations required petitioner to have regular recent flying experience in order to fly an airplane with passengers.

Petitioner flew the airplane on Intel business. Whenever petitioner flew pursuant to his employment at Intel, either a pilot or another person flew with him. Petitioner used the airplane to make the following flights pursuant to his employment with Intel in 1983:

| Date | Destination | Flight time | Description |
|---|---|---|---|
| May 15-16 | Santa Ana, CA | 4.9 hours | Petitioner attended the National Computer Conference trade show. Intel reimbursed petitioner $414. |
| July 7 | Hillsboro, OR | 4.0 hours | Petitioner attended meetings at the Intel Corp.'s Hillsboro facility. He was a featured speaker. |
| Sept. 14 | Hillsboro, OR | 3.4 hours | Petitioner attended a board meeting for Intel Corp. |
| Sept. 26 | Santa Ana, CA | 2.4 hours | Petitioner attended a Dataquest conference representing Intel Corp. as a key speaker. |
| Dec. 8 | Albuquerque, NM | 5.5 hours | Petitioner attended an Intel Corp. forum and press conference. Two other passengers flew with petitioner and Intel Corp. reimbursed him $610. |
| Dec. 15 | Burbank, CA | 2.0 hours | Petitioner represented Intel at a dinner meeting in Los Angeles with members of Hamilton-Avent Electronics, a distributor of Intel Corp. products. |
| Total | | 22.2 hours | |

Petitioner made the following flights in connection with his service as a regent of the University of California and a trustee of Grinnell College in 1983:

| Date | Destination | Flight time | Description |
|---|---|---|---|
| May 8-9 | Des Moines, IA | 8.4 hours | Attend board of trustees meeting |
| Nov. 3 | Des Moines, IA | 9.4 hours | Attend board of trustees meeting |

| Date | Destination | Flight time | Description |
|------|-------------|-------------|-------------|
| Nov. 28 | Los Alamos, NM | 6.5 hours | Attend committee on oversight of the Department of Energy laboratories as a regent of the University of California. Four other regents and the secretary of regents accompanied as passengers. |
| Total | | 24.3 hours | |

All these flights, including those to Grinnell College and University of California, were flights within the scope of petitioner's duties for Intel.

In 1983, petitioner also used the airplane for personal flight training for approximately 18 hours. This training did not qualify him to be a charter pilot, and petitioner's ability to pilot the airplane was not a minimum education requirement for his employment at Intel.

Petitioner saved substantial flying time by using the airplane for trips to the Intel site at Hillsboro, the Grinnell College Board of Trustee meetings in Des Moines, and the University of California Board of Regents meeting at Los Alamos. In other cases, commercial flight time was comparable to that of the airplane, but petitioner's freedom from commercial airline schedules allowed him to attend other meetings before or after those trips. Petitioner could accept additional requests for speeches and appearances knowing he would not be dependent upon commercial airline schedules. Because petitioner had access to a private airplane, he was able to squeeze business meetings and appearances into a few hours that otherwise might have taken 2 days.

### Intel Travel Reimbursement Policy

The Intel travel reimbursement policy in 1983 provided for reimbursement for air travel at commercial airline rates, regardless of whether the employee elected to fly first class or by private airplane. Intel employees paid their own travel expenses to the extent they exceeded the commercial airfare. The Intel reimbursement policy was applicable to all employees without exception. It was inconsistent with the Intel culture that the Intel travel reimbursement policies or Intel business expense policies be altered for any officer of the executive staff, including petitioner. Intel would not

vary its reimbursement policy even if an employee could improve his efficiency by using first class or private-air travel in the performance of his job duties.

It was Intel's policy that its officers incur expenses for the benefit of Intel, without reimbursement. A specific example of such expenses would be the extra cost of flying first class when it was in the company's best interest to do so. Intel considered such expenses inappropriate for reimbursement in light of the salary and other remunerations an Intel officer received.

In accordance with Intel policy, petitioner expected to personally assume responsibility for paying any flight expenses he incurred in excess of Intel's reimbursement policy. Petitioner, as one of the architects and the champion of the Intel culture, viewed himself as one who should set an example of living and abiding by that culture. As such, petitioner would not have considered seeking reimbursement beyond the Intel travel reimbursement policy.

Companies with which Intel competes, and with which Intel does business, use private aircraft for their executive business travel. Intel, however, did not consider owning or chartering a private airplane in 1983, as it would have been contrary to the Intel corporate culture to do so. Similarly, petitioner would not consider requesting Intel to charter his airplane because of the perceived conflict of interest.

Petitioner's commercial coach airfare costs for attending Intel meetings and for attending Grinnell College Board of Trustee meetings and University of California Board of Regents meetings would have been reimbursed by Intel pursuant to, and in accordance with, Intel's business travel reimbursement policy if he had sought reimbursement. In many instances, petitioner failed to submit such reimbursement claims. Petitioner received reimbursement from the University of California for commercial airfare and per diem in connection with his services as a regent. Petitioner took commercial flights approximately 60 percent of the time and utilized privately owned aircraft for the balance of the trips.

## Commercial Alternatives

In 1983, commercial flights were available from San Jose, California, to Portland, Oregon; Santa Ana, California;

Albuquerque, New Mexico; Burbank, California; and Des Moines, Iowa. In 1983, there were no commercial flights from San Jose to Hillsboro, Oregon; Los Alamos, New Mexico; or Grinnell, Iowa.

Travel itineraries from San Jose to Los Alamos, Grinnell, and Hillsboro were as follows:

| | |
|---|---|
| LOS ALAMOS, NM | —90 miles from Albuquerque (ABQ)<br>—no service to Los Alamos from SJC or SFO<br>—requires car for 90-mile trip<br>  e.g., Dep: SJC 12:25 p.m.<br>      Arr: ABQ 4:40 p.m. (one flight daily)<br>        + 2 hours for car rental and drive time |
| CITATION FLIGHT TIME | 2.6 hrs. (SJC to Los Alamos) |
| GRINNELL, IA | —50 miles from Des Moines<br>—no direct service from SJC or SFO<br>—requires car for 50-mile trip<br>—Des Moines can be reached from SJC or SFO via Denver, Phoenix, Chicago or Dallas<br>  e.g., Dep: SJC 6:30 a.m.<br>      Arr: Denver 10:00 a.m.<br>      Dep: Denver 10:27 a.m.<br>      Arr: Des Moines 1:02 p.m. + 1-1/2 hours for car rental and drive time |
| CITATION FLIGHT TIME | 3.9 hrs. (SJC to Grinnell) |
| HILLSBORO, OR | —regular service SJC to Portland (PDT)<br>—Intel plant a 45-min. drive through downtown Portland to Hillsboro<br>—Intel plant is located next to Hillsboro airport<br>  e.g., Dep: SJC 8:05 a.m.<br>      Arr: PDT 9:42 a.m. + 1 hour, 15 minutes for car rental and drive time |
| CITATION FLIGHT TIME | 1.8 hrs. (SJC to Hillsboro) |

The direct operating costs of the airplane are between $250 and $300 per hour (excluding fixed expenses—insurance, hangar, and depreciation). The commercial round-trip airfares for flights from San Jose to the following cities in 1983 were approximately the amounts set forth below:

| *Commercial airfare* | *City* |
|---|---|
| $250 | Portland |
| 125 | Santa Ana |
| 125 | Burbank |

Compared to commercial airlines, for example on the San Jose to Portland trip, the airplane cost approximately four times as much to operate for one person. However, to replicate the schedule and time savings of petitioner's flights via commercial travel would have cost more than the cost of operating the airplane.

*Airplane Charter Business*

In addition to use in his employment, petitioner used the airplane in an air-charter business he started in 1983. Incident to use of the airplane in the charter business, petitioner entered into an agreement with ACM Aviation, Inc. (ACM) under which ACM was to operate the airplane. ACM managed airplanes for others, provided in-house aircraft maintenance, fueled aircraft, and offered complete fixed-based operation services. ACM also owned and operated its own airplanes. Petitioner chose ACM as his charter operator primarily because he knew the manager-owner of ACM and knew him to be primarily interested in safety which was petitioner's greatest concern in chartering the airplane.

At the time petitioner acquired the airplane, it was properly equipped for rental to third parties or for use by petitioner, but was not properly equipped for use in the charter business. Several pieces of equipment were required to be installed and tested to ready the airplane for the charter business. In addition, crew members needed to have a rating in the particular make and model of the airplane in order to fly it in the air-charter business. Some of this training could have been done in any airplane of the same make and model. However, some of the flight training, particularly landing the airplane, had to be conducted in petitioner's airplane. All the equipment installation, equipment testing, and flight training had to be completed before the airplane was ready for service in the air-charter business.

ACM advertised its business and conducted charter operations on behalf of petitioner. During 1983, the airplane was chartered for 7.6 hours of flight time. The dates, destinations, and flight times of the airplane for the 1983 ACM charter flights were as follows:

| Date | Destination | Flight time |
|------|-------------|-------------|
| Oct. 10 | Portland, OR | 3.8 hours |
| Oct. 21 | Phoenix, AR | 3.8 hours |
| | | 7.6 hours |

The dates and flight times of the airplane in 1983 for ACM crew training were as follows:

| Date | Flight time |
|------|-------------|
| May 14 | 1.7 hours |
| July 26 | 3.6 hours |
| July 27 | 0.7 hours |
| Aug. 4 | 7.2 hours |
| Aug. 5 | 2.8 hours |
| | 16.0 hours |

The dates and flight times of the airplane in 1983 for maintenance were as follows:

| Date | Flight time |
|------|-------------|
| May 10-13 | 1.0 hours |
| June 20 | 0.6 hours |
| July 20 | 2.4 hours |
| Sept. 8 | 0.2 hours |
| Sept. 15 | 0.8 hours |
| Sept. 21 | 0.2 hours |
| | 5.2 hours |

During 1983, petitioner also used the airplane for personal flights. Total flying time for personal use was 45.6 hours. Expenses related to these flights were not deducted, and petitioners concede that expenses and depreciation with respect to these personal flights are not deductible.

On their 1983 return, petitioners deducted depreciation and expenses attributable to the use of the airplane in both petitioner's employment with Intel and the ACM charter flights. Petitioners computed these deductions by determining the total possible depreciation and total airplane expense for the year and multiplying these totals by the ratio of business flight hours to total flight hours (business-use ratio). Total hours of flight time for the airplane in 1983 break down into the following use categories.

| Type of | Hours of flight time |
|---|---|
| Use in employment of Intel........................... | 46.5 hours |
| Petitioner training flights ........................... | 18.1 hours |
| ACM flight crew training ........................... | 16.0 hours |
| ACM charter flights ............................... | 7.6 hours |
| Maintenance flights .............................. | 5.2 hours |
| Delivery......................................... | 8.4 hours |
| Personal use..................................... | 45.6 hours |
| Total...................................... | 147.4 hours |

Petitioners originally computed the business-use ratio with a numerator including the Intel and the ACM charter flight hours (46.5 hours + 7.6 hours) and a denominator including the Intel, ACM charter, and personal-use hours (46.5 hours + 7.6 hours + 45.6 hours). The business use of the airplane thus computed was 54.3 percent. The delivery flight time, maintenance flight time, petitioner's flight-training time, and the ACM crew-training time were excluded from petitioners' computation altogether. The total expenses and depreciation before reduction by the business-use ratio were $49,551 and $207,114, respectively. Based on the business-use percentage of 54.3 percent, petitioners deducted $26,906 of expenses and $112,463 of depreciation.

In his notice of deficiency, respondent allowed the expenses and depreciation related to the October charter flights. Respondent disallowed all but $9,647 of depreciation and $3,348 of expenses.

Petitioners have conceded that they may not deduct any expenses related to petitioner's employment by Intel to the extent that Intel would have provided reimbursement. They maintain that deduction of Intel-related airplane expenses that exceed the reimbursable portion was proper. However, petitioners now also seek to establish the deductibility of depreciation and expenses related to petitioner's flight training and maintenance flights which were not claimed on their return.

### OPINION

The primary issue for decision is whether petitioners may deduct operating expenses and depreciation with respect to use of the airplane for petitioner's travel on behalf of Intel.

Section 162(a)[2] allows a taxpayer to deduct ordinary and necessary expenses paid or incurred in carrying on a trade or business. Section 168 allows a deduction for depreciation of tangible property used in a taxpayer's trade or business. Petitioners have the burden of proving their entitlement to these deductions. Rule 142(a); *Welch v. Helvering,* 290 U.S. 111 (1933).

A taxpayer is considered to be in the trade or business of being an employee separate and apart from the trade or business of his corporate employer. *Leamy v. Commissioner,* 85 T.C. 798, 809 (1985); *Lucas v. Commissioner,* 79 T.C. 1, 6-7 (1982); *Primuth v. Commissioner,* 54 T.C. 374, 377 (1970). See Rev. Rul. 62-180, 1962-2 C.B. 52. However, the voluntary payment or guarantee of corporate obligations by corporate officers, employees, or shareholders may not be deducted on the taxpayer's personal return. *Noland v. Commissioner,* 269 F.2d 108, 111 (4th Cir. 1959), affg. a Memorandum Opinion of the Court; *Gantner v. Commissioner,* 91 T.C. 713, 726 (1988), affd. 905 F.2d 241 (8th Cir. 1990). In *Noland,* the Court stated that:

When the corporation, reimbursing its officers and employees for direct expense incurred in furthering its business, does not reimburse an officer for particular expense, that expense prima facie is personal, either because it was voluntarily assumed or because it did not arise directly out of the exigencies of the business of the corporation. [*Noland v. Commissioner, supra* at 113. Citations omitted.]

Respondent contends that petitioner voluntarily used his airplane and assumed the airplane expenses and, therefore, is not entitled to the claimed deductions. Petitioners argue that there was no voluntary assumption of corporate obligations because the airplane was used and the expenses were incurred pursuant to written corporate policy.[3] We agree with petitioners.

Respondent's Revenue Ruling 57-502, 1957-2 C.B. 118, acknowledges that a corporate resolution or policy requiring a corporate officer to assume such expenses indicates that they are his expenses as opposed to those of the corpora-

---

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[3]Petitioners agree that their deductions must be reduced by any reimbursements actually made to petitioner plus any amounts which were reimbursable.

tion. In *Gantner*, we disallowed the taxpayer's deduction for expenses and depreciation related to a computer system which he purchased and used in the operation of the Northstar Driving School, Inc. The taxpayer was an officer and a 50-percent shareholder of Northstar. Even though the taxpayer used the equipment in his employment with the corporation, we found that the deductions were not attributable to the taxpayer's role as an employee noting that "There was no corporate resolution or requirement that petitioner, as an employee, incur those expenses." *Gantner v. Commissioner*, 91 T.C. at 726. Similarly, in *Stolk v. Commissioner*, 40 T.C. 345 (1963), affd. 326 F.2d 760 (2d Cir. 1964), we disallowed a corporate officer's deduction of expenditures for entertainment and gifts, in part, for the taxpayer's failure "to prove that as part of his duties the corporation expected or required him to assume and pay from his own funds any of the disputed expenses, without payment." *Stolk v. Commissioner*, 40 T.C. at 357.

In *Lockwood v. Commissioner*, T.C. Memo. 1970-141, the taxpayer was an officer of Momex, Inc., but not a shareholder. The taxpayer's wife was a 25-percent shareholder in Momex but not an employee. The shareholders and officers of Momex agreed that the officers would pay out of their own pocket, without corporate reimbursement, certain travel and entertainment expenses incurred by them on behalf of the corporation. We held that the taxpayer's travel expenses incurred on behalf of the corporation were deductible.[4]

In the instant case, Intel had a written travel reimbursement policy explicitly stating that it expected its officers to incur certain expenses for Intel's benefit, despite the fact that such expenses would not be reimbursed. Reimbursement of such expenses was considered inappropriate in light of the corporate culture and the officers' overall compensa-

---

[4]In *Gantner v. Commissioner*, 91 T.C. 713, 726 (1988), affd. 905 F.2d 241 (8th Cir. 1990), we stated that *Lockwood v. Commissioner*, T.C. Memo. 1970-141, did not support the taxpayer's argument for deductibility because, unlike *Gantner*, the taxpayer in *Lockwood* was not a shareholder in the employer corporation, and therefore, there was no issue of capital contribution. Respondent does not rely here on petitioner's proprietary interest in Intel to support his argument. However, even if he had, we do not feel it merits a different result. Petitioner owns less than 3 percent of Intel, a large public company. The taxpayer in *Lockwood* arguably had a greater proprietary interest in Momex via his wife's 25-percent ownership.

tion. An example of such expenses is the excess cost of first-class airfare over coach airfare when first-class travel was necessary for business purposes. We find that Intel expected petitioner, as a corporate official, to incur and pay travel expenses in excess of the amount which was reimbursable under its policy. Therefore, we hold that petitioner's use of the airplane and payment of the attendant expenses do not constitute the voluntary assumption of corporate expenses.

Respondent argues that by virtue of petitioner's position as founder and chief executive officer of Intel and his involvement in the development of its corporate culture, petitioner, in effect, required himself to assume the travel expenses and, therefore, such assumption was voluntary.

The Intel culture and travel policies that precluded Intel's payment of petitioner's total travel costs were in place prior to petitioner's purchase and use of the airplane and were clearly policies that were established for business purposes. In order to find that petitioner required himself to assume the travel expenses, we would have to ignore the corporate entity of Intel. Courts have consistently interpreted *Moline Properties, Inc. v. Commissioner*, 319 U.S. 436 (1943), to preclude ignoring the corporate form when adoption of that form served a business purpose. *Moncrief v. United States*, 730 F.2d 276, 280 (5th Cir. 1984). Respondent has not argued, nor could it be seriously contended, that Intel served no business purpose. Therefore, despite petitioner's participation in establishing the Intel policy, we find he did not "voluntarily assume" the travel expenses.

Having found that the use and expenses of the airplane were not corporate obligations which were voluntarily assumed, we must decide if the expenses are ordinary and necessary expenses of petitioner's employment. An expense is necessary if it is appropriate and helpful in carrying on the trade or business. *Heineman v. Commissioner*, 82 T.C. 538, 543 (1984) (citing *Commissioner v. Tellier*, 383 U.S. 687, 689 (1966); *Welch v. Helvering*, 290 U.S. at 113). An expense is ordinary when the paying thereof is the common and accepted practice in light of the time and place and circumstance. *Welch v. Helvering, supra* at 113-114.

In Revenue Ruling 70-558, 1970-2 C.B. 35, respondent held that a Federal Government employee who used his privately owned airplane on official business trips was entitled to deduct expenses and depreciation allocable to such use to the extent those amounts exceeded the standard rate travel reimbursements received from the Government. The taxpayer in Revenue Ruling 70-558 was not required by his employer to use his private airplane but was permitted to do so because of the urgency of his trips. For purposes of determining whether petitioner's use of his airplane was ordinary and necessary, we can discern no meaningful distinction between his situation and the facts in Revenue Ruling 70-558.

It is undisputed that petitioner's duties as vice chairman of Intel required frequent and extensive travel, some of which was not regularly or easily scheduled. Furthermore, the parties agree that petitioner's access to the airplane enabled him to reduce significantly his traveling time, thereby allowing him to attend an increased number of meetings and make an increased number of appearances. Consequently, there can be little dispute that use of the airplane was "appropriate and helpful" to the execution of petitioner's duties. Furthermore, respondent's Revenue Ruling 57-502, 1957-2 C.B. 118, states that "a resolution requiring the assumption of such expenses by * * * [a corporate officer] would tend to indicate that they are a necessary expense of his office." Based on all of the foregoing, we find the airplane expenses for the Intel flights were a necessary expense of petitioner's business as a corporate official.

The expenses of using the airplane must also be ordinary in order to be deductible. *Welch v. Helvering, supra* at 113. The principal function of the word "ordinary" in section 162(a) is to clarify the distinction between expenses which are currently deductible and expenses which are capital in nature. *Commissioner v. Tellier,* 383 U.S. 687, 689 (1966). The expenses at issue here were not incurred in the acquisition of a capital asset but in the conduct of petitioner's duties as an employee of Intel.

Petitioner traveled by private aircraft only when there was business advantage in doing so. The cost of replicating

petitioner's travel schedule and time savings via commercial charter carrier would have exceeded the costs of operating petitioner's airplane. In light of Intel's policies and petitioner's travel requirements, we hold that payment of the excess travel expenses arising from petitioner's use of the airplane was ordinary under the circumstances. See *Lockwood v. Commissioner, supra.*

It has been held that for an expense to be considered ordinary and necessary, it must also be reasonable in amount. *Commissioner v. Lincoln Electric Co.,* 176 F.2d 815, 817 (6th Cir. 1949); see sec. 1.162-2(a), Income Tax Regs. Respondent argues that the expenses are not ordinary and necessary because petitioners' claimed deduction of $139,369 in connection with the airplane is unreasonable in light of the $105,076 salary petitioner was paid as vice chairman of Intel in 1983.[5] The issue here is whether the Intel-related airplane *expenses* are reasonable in amount. Petitioners argue that in determining reasonableness of the amount of business expenses for purposes of section 162, only out-of-pocket expenses should be considered and that the statutory allowance for depreciation should be excluded from consideration. For purposes of this issue, the $139,369 figure, which respondent relies on, can be broken down as follows:

|  | *Expenses* | *Depreciation* |
|---|---|---|
| Intel flights | $23,140 | $96,722 |
| ACM charter flights | 3,766 | 15,741 |
|  | 26,906 | 112,463 |

Whether depreciation should be included in the amount of expenses in making a reasonableness determination depends on whether it is a "business expense" under section 162. The regulations under section 162 provide in relevant part that "Business expenses deductible from gross income include the ordinary and necessary *expenditures* directly connected with or pertaining to the taxpayer's trade or business, *except items which are used as the basis for a deduction or a credit under provisions of law other than*

---

[5]In respondent's opening brief he states: "On his return, the petitioner deducted $139,369.00 of *expenses* for flying the plane. This *expense* produced only $105,076.00 of wages." (Emphasis added.)

*section 162."* Sec. 1.162-1(a), Income Tax Regs.[6] (Emphasis added.) Depreciation is not really an "expenditure" but an allowance based on a presumed wasting of a previous capital investment. See 5 J. Mertens, Law of Federal Income Taxation, sec. 23A.03, at 14 (1974 rev.). The authority for deducting an allowance for depreciation in this case is section 168. Therefore, depreciation does not fall under the regulatory rubric of trade or business expense. As such, the section 168 depreciation deduction amount should not be included in the amount of business expense, the reasonableness of which is to be determined.

To hold otherwise would raise serious problems since allowable deductions for depreciation will often not be reflective of economic depreciation. If we were to look simply at the combination of allowable depreciation deductions and other expenditures for a particular year, the combination of these amounts might often seem exorbitant in amount, especially in the early years of operation. Respondent has not argued that we should consider actual economic depreciation. In the instant case, however, the $96,722 depreciation allowance did not reflect actual economic depreciation. The airplane did not decrease in value but increased in value by approximately $340,000 from 1983 to 1989. Therefore, petitioner did not suffer an actual economic loss in addition to his out-of-pocket expenditures of $23,140.

The issue then is whether the $23,140 expended for Intel flights is a reasonable amount of expense under the circumstances. Whether an expenditure is reasonable or not for purposes of section 162 is a question of fact. *Boser v. Commissioner,* 77 T.C. 1124, 1133 (1981), as amended 79 T.C. II (1982), affd. by unreported order (9th Cir., Dec. 22, 1983). We do not find the amount of business expense to be unreasonable. The parties have stipulated to the fact that replication of petitioner's private airplane flights through a commercial service would have been more costly. Therefore, we hold petitioners are entitled to deduct petitioner's

---

[6]"In general, we must defer to Treasury Regulations as long as they 'implement the congressional mandate [to prescribe all needful rules for the enforcement of the Internal Revenue Code] in some reasonable manner.' " *Phillips Petroleum Co. & Affiliated Subsidiaries v. Commissioner,* 97 T.C. 30, 34 (1991) (citing *United States v. Correll,* 389 U.S. 299, 307 (1967)).

out-of-pocket expenses of operating the airplane with respect to the Intel-related flights to the extent they exceed the reimbursable expenses.

With respect to depreciation, respondent states on brief that he "agrees that if the Court finds that the petitioner flying his own plane is ordinary and necessary that the amount of depreciation is reasonable." Nevertheless, respondent appears to argue that whether depreciation is deductible at all is dependent on whether the asset's use is "ordinary and necessary," and that the combined amount of deductions for depreciation and business expense must be "reasonable" in order to be "ordinary and necessary." Such a position is without support in the law.

Availability of deductions for depreciation on tangible property in this case is dependent solely upon compliance with section 168, which has only two requirements for deduction of depreciation. First, the asset (tangible) must be of a type which is subject to wear and tear, decay, decline, or exhaustion. Sec. 168(c); sec. 1.167(a)-2, Income Tax Regs. Second, the property must be used in the taxpayer's trade or business or held for the production of income. Sec. 168(c)(1). The language of the section is unequivocal.

SEC. 168. ACCELERATED COST RECOVERY SYSTEM.

(a) ALLOWANCE OF DEDUCTION.—There shall be allowed as a deduction for any taxable year the amount determined under this section with respect to recovery property.

(b) AMOUNT OF DEDUCTION.—

(1) IN GENERAL.—Except as otherwise provided in this section, the amount of the deduction allowable by subsection (a) for any taxable year shall be the aggregate amount determined by applying to the unadjusted basis of recovery property the applicable percentage determined in accordance with the following table:

     \*     \*     \*     \*     \*     \*     \*

(c) RECOVERY PROPERTY.—For purposes of this title—

(1) RECOVERY PROPERTY DEFINED.—Except as provided in subsection (e), the term "recovery property" means tangible property of a character subject to the allowance for depreciation—

(A) used in a trade or business, or

(B) held for the production of income.

Nowhere in the language of section 168 is there a suggestion that availability of the depreciation deduction is dependent on satisfaction of the requirements of section

162. There simply is no requirement that the use of the depreciable property be "ordinary" or "necessary." The only requirement is that it be used in the taxpayer's trade or business.

Subsequent legislative enactments and the accompanying legislative history support our finding that there are no requirements for deducting depreciation allowances other than those imposed by section 168.[7] In 1984, as part of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat 494, Congress added section 280F to the Internal Revenue Code. This section places limitations on the investment tax credit and depreciation deductions that may be taken for luxury automobiles and certain listed property used by taxpayers in their trade or business. Sec. 280F.

With respect to depreciation of luxury automobiles, the House report stated that under the then current law:

A taxpayer who acquires an automobile for use in a trade or business and uses it for business purposes is entitled to an investment tax credit and cost recovery deductions under the Accelerated Cost Recovery System (ACRS), in addition to deductions for operating and maintenance expenses.

The report then goes on to state that:

the extra expense of a luxury automobile operates as a tax-free personal emolument which the committee believes should not qualify for tax credits and deductions. [H. Rept. 98-432 (Part II), 1387 (1984).]

Subsequently, section 280F was enacted containing a schedule designating maximum automobile depreciation that a taxpayer may deduct. See sec. 280F(a)(1). In addition, section 280F(d)(3) provides that property used as a means of transportation by an employee shall not be considered used in a trade or business for purposes of determining deductible depreciation unless such use "is required for the convenience of the employer and as a condition of employment." H. Rept. (Conf.) 98-861 (1984), 1984-3 C.B. (Vol. 2) 1, 281. The apparent intent behind section 280F is to impose a type of necessary and reasonableness requirement on the

---

[7]"[T]he view of a later Congress does not establish definitively the meaning of an earlier enactment, but it does have persuasive value." *Bell v. New Jersey*, 461 U.S. 773, 784 (1983).

deductibility of depreciation allowances for property used in a trade or business.[8]

Finally, we note that respondent has unsuccessfully made this argument before this Court on a prior occasion. In *Hoye v. Commissioner,* T.C. Memo. 1990-57, the language of respondent's statutory notice conditioned allowance of the deduction for depreciation and investment tax credit upon a motor home being "ordinary or necessary to [taxpayer's] trade or business, in accordance with section 162." We characterized that position as untenable. At trial and on brief, respondent argued instead that the taxpayers were not entitled to the depreciation deduction or investment tax credit because the amounts claimed were unreasonable. We observed that the cases on which respondent relied involved section 162, and that the taxpayers were entitled to depreciation if the property was used in their trade or business. Since respondent did not challenge the fact that the motor home was used in the taxpayer's trade or business, we held that the taxpayers were entitled to deduct depreciation to the extent the motor home was used in his trade or business. *Hoye v. Commissioner, supra.*

Based on the foregoing, we find that petitioners are entitled to deduct depreciation on the airplane to the extent of its use in petitioner's employment.

Petitioners also seek to deduct the depreciation and expenses related to petitioner's use of the airplane for flight training. Although expenses for education are not explicitly referred to in section 162, the regulations provide guidelines for determining whether such expenses are deductible. Sec. 1.162-5, Income Tax Regs. Generally, education expenses are deductible if the education maintains or improves the skills required in the employment of the taxpayer, or if the education meets the express requirements of the taxpayer's employer imposed as a condition to the retention of employment. Sec. 1.162-5(a)(1) and (2), Income Tax Regs.

---

[8]See also *Hamby v. Commissioner,* T.C. Memo. 1988-555, in which we held that the taxpayer was entitled to a depreciation deduction and investment tax credit with respect to a 1955 Mercedes Benz Gullwing Coupe to the extent used in his trade or business. In the course of the opinion, we noted that the result would have been different in the following year since sec. 280F would have applied to limit available depreciation and investment tax credit on luxury cars.

Whether education maintains or improves skills required by the taxpayer's employment must be determined from all of the facts and circumstances involved. *Boser v. Commissioner,* 77 T.C. at 1131. This Court has found flight-training expenses deductible for taxpayers not in the trade or business of flying and taxpayers not required by their employers to have that particular skill. See *Boser v. Commissioner, supra; Behm v. Commissioner,* T.C. Memo. 1987-157. However, the taxpayers in those cases established a substantial nexus between the training and the skills required in their employment. Here, petitioners have failed to establish such a nexus. Petitioner's use of the airplane with respect to his employment with Intel constituted only 31.5 percent of the airplane's use in 1983. The record does not reflect how often petitioner piloted the airplane on these trips. Clearly, there was no requirement that he do so. It is clear that a significant portion of the airplane's use was personal. On the basis of the record before us, we find that petitioners have failed to prove they are entitled to deduct expenses and depreciation related to petitioner's flight training as an educational expense under section 162.

The next issue for decision is whether the expense and depreciation related to the maintenance flights may be deducted.[9] Respondent contends depreciation and expense for the maintenance flights are not deductible as they occurred prior to commencing operations of the charter business. It is well established that expenses incurred before a taxpayer's business begins to operate (startup expenses) are not deductible. *Richmond Television Corp. v. United States,* 345 F.2d 901 (4th Cir. 1965), vacated and remanded on other issues 382 U.S. 68 (1965), original holding on this issue reaffd. 354 F.2d 410 (4th Cir. 1965), overruled on other grounds *NCNB Corp. v. United States,* 684 F.2d 285 (4th Cir. 1982). Nor is depreciation allowed on assets acquired for a business that has not begun operations. *Piggly Wiggly Southern, Inc. v. Commissioner,* 84 T.C. 739, 745-746 (1985) (citing *Richmond Television Corp. v. United States, supra*), affd. 803 F.2d 1572 (11th Cir. 1986).

---

[9]Respondent concedes the deductibility of depreciation and expenses for the two charter flights in October 1983.

Petitioner has not established that the charter business began operations prior to October 1983. Petitioner testified that the maintenance flights were related to the installation, testing, and maintenance of the airplane and newly installed equipment in preparation of employing the airplane in the ACM charter business.[10] Consequently, no deduction for depreciation may be taken with respect to these flights. The expenditures related to such maintenance flights were startup expenses and, therefore, were not deductible.

We must now determine the total allowable amount of deductible expenses and depreciation with respect to the use of the airplane in 1983. Unless a taxpayer can prove the actual business expenses, only that percentage of the total expense attributable to the business use is deductible. See *Cobb v. Commissioner*, 77 T.C. 1096, 1101-1102 (1981); *Henry Schwartz Corp. v. Commissioner*, 60 T.C. 728, 744 (1973). Similarly, petitioners are entitled to a depreciation deduction measured by the percentage of business use. *Henry Schwartz Corp. v. Commissioner, supra.*

The parties disagree on whether the flight hours for maintenance, ACM crew training, and delivery[11] should be included in the denominator of the business-use ratio used to determine total allowable depreciation. Respondent asserts that the hours should be included while petitioners contend that such inclusion is tantamount to treating those hours as personal-use hours, which they argue is improper. We agree with respondent.

Petitioners cite no authority on point in support of their position. As a matter of mathematics, failure to include the flight hours at issue in the denominator of the business-use ratio effectively allows some depreciation for those flight hours. While use of the asset for startup purposes is not a personal use, it is, nonetheless, a use of the asset and should not be excluded from the business-use ratio. See *Richmond Television Corp. v. Commissioner, supra; Piggly Wiggly Southern, Inc. v. Commissioner, supra.*

Based on the preceding, we hold that all flight hours of the airplane in 1983 (147.4) are to be included in the denominator of the business-use ratio for determining allow-

---

[10]See appendix par. 3.

[11]See appendix par. 1.

able depreciation for 1983. The hours of business use to be included in the numerator of the ratio include Intel flight hours (46.5) and the charter flight hours (7.6). Therefore, we hold that the percentage of business use of the airplane was 36.7 percent (54.1/147.4) in 1983. Petitioners may deduct this portion of depreciation and expenses to the extent it exceeds the reimbursable portion of the expense.

Finally, we must decide whether petitioners are entitled to an investment tax credit with respect to petitioner's use of the airplane. Section 38 allows a tax credit for investments in section 38 property. Section 38 property is generally any tangible personal property for which depreciation is allowable under sections 167 or 168. Sec. 48(a). The airplane satisfies the definition of section 38 property and, therefore, qualifies for the credit. However, the regulations provide that the property is eligible for the credit only to the extent that depreciation deductions are allowed for the year. Sec. 1.48-1(b)(2), Income Tax Regs. Thus, if property is used 80 percent of the time in a trade or business, only 80 percent of the basis qualifies as section 38 property. Therefore, petitioners are entitled to the investment tax credit for the airplane in the same proportion as the allowable depreciation determined above.

*Decision will be entered under Rule 155.*

Reviewed by the Court.

NIMS, CHABOT, KÖRNER, SWIFT, GERBER, WRIGHT, WELLS, WHALEN, COLVIN, and BEGHE, *JJ.,* agree with the majority opinion.

APPENDIX

1. The flight time for delivery of the airplane from Wichita, Kansas, to San Jose, California, on April 27-28, 1983, was 8.4 hours.

2. The dates and flight times of the airplane in 1983 for ACM crew training are as follows:

| Date | Flight time |
| --- | --- |
| May 14 | 1.7 hours |
| July 26 | 3.6 hours |

| Date | Flight time |
|------|-------------|
| July 27 | 0.7 hours |
| Aug. 4 | 7.2 hours |
| Aug. 5 | 2.8 hours |
| | 16.0 hours |

3. The dates and flight times of the airplane in 1983 for maintenance are as follows:

| Date | Flight time |
|------|-------------|
| May 10-13 | 1.0 hours |
| June 20 | 0.6 hours |
| July 20 | 2.4 hours |
| Sept. 8 | 0.2 hours |
| Sept. 15 | 0.8 hours |
| Sept. 21 | 0.2 hours |
| | 5.2 hours |

4. The dates, destinations, and flight times of the airplane in 1983 for petitioner's pilot-training flights are as follows:

| Date | Destination | Flight time |
|------|-------------|-------------|
| Apr. 29 | Napa, CA | 1.8 hours |
| Aug. 24 | Wichita, KS | 12.6 hours |
| Oct. 8 | Local | 2.0 hours |
| Dec. 13 | Local | 1.7 hours |
| | | 18.1 hours |

5. The dates, destinations, and flight times of the airplane in 1983 for the ACM charter flights are as follows:

| Date | Destination | Flight time |
|------|-------------|-------------|
| Oct. 10 | Portland, OR | 3.8 hours |
| Oct. 21 | Phoenix, AR | 3.8 hours |
| | | 7.6 hours |

HALPERN, *J.*, concurring: While I concur in the result reached by the majority, I am unable to join in the reasoning with respect to the depreciation deduction claimed by petitioner. I believe that the majority's narrow focus on the ratio of business use to total use is premised upon an over-simplified conception of depreciation. Although the majority's analysis seems to reach the appropriate result in this case, I fear it may lead to inappropriate results in the future.

Depreciation is defined for Federal income tax purposes as the decline in value of property caused by exhaustion,

wear and tear, and obsolescence. See sec. 167(a). Such factors effect a decline in the value of property in two ways: (1) By use, and (2) with the passage of time. The former (use depreciation) is evident in the simple observation that certain assets tend to wear out more, and decline in value faster, when put to use.[1] The latter (nonuse depreciation) is evident in the fact that certain assets decline somewhat in value even when wholly unused.[2] Many assets decline in value due to both use depreciation and nonuse depreciation.[3]

In this case, we are required to determine whether and to what extent petitioner is entitled to a depreciation deduction. Thus, we must distinguish between that portion of the year's depreciation (both use depreciation and nonuse depreciation) for which a deduction is allowable (allowable depreciation), and that portion of the year's depreciation for which a deduction is not allowable (nonallowable depreciation).[4] The majority, however, apportions the year's depreciation as if use depreciation were the only component to apportion. They disregard the nonuse component.

In many cases, where allowable use depreciation mirrors allowable nonuse depreciation, the majority's neglect will be benign, and the majority's analysis will produce the right result. However, the percentage of use depreciation that is allowable may differ from the percentage of nonuse depreciation that is allowable. Consider a wealthy collector of airplanes, whose sole purpose in purchasing such airplanes is to impress his friends with his wealth and extravagance. As a wholly incidental matter, however, and hoping to achieve a tax deduction, wealthy collector flies each airplane once a year on a business trip. Wealthy collector never flies any of the planes for personal use. Under the majority's analysis, wealthy collector is entitled to 100 percent of the

---

[1] For example, a 1982 automobile with 300,000 miles will generally be in worse condition and sell for far less than a 1982 automobile (same model) with only 30,000 miles.

[2] Computers, for example, decline rapidly in value, even when unused, due to obsolescence. Nonuse depreciation, however, is not due exclusively to obsolescence. Thus, even automobiles, which are not generally thought of in the short run as becoming obsolete, suffer some nonuse depreciation. Thus, a 1982 automobile with 30,000 miles will be in worse condition and sell for less than a 1987 automobile (same model) with the same mileage.

[3] For example, an automobile wears out, somewhat, merely with the passage of time, but wears out faster when put to use.

[4] A depreciation deduction is only allowable for trade or business property or property held for the production of income. Sec. 167(a). Moreover, entitlement to a depreciation deduction is always predicated on a profit motive. Sec. 183(a).

potential depreciation deductions. Clearly, however, such result would be absurd. The problem is that wealthy collector purchased and continues to maintain the planes solely for personal reasons, and thereby incurs the nonuse component of depreciation solely for personal purposes. Thus, any depreciation deduction allowed for the nonuse component of depreciation would result in an undeserved tax windfall for wealthy collector. While that, admittedly, is an extreme case, the lack of symmetry (between allowable and nonallowable use depreciation on the one hand and allowable and nonallowable nonuse depreciation on the other) may be present in other cases as well, even if to a lesser extent. At the time a depreciable asset is placed in service, the percentage of allowable nonuse depreciation for that year can be determined, independent of whatever actual business or personal use of that asset thereafter occurs.[5] Thus an examination of taxpayer's motivation for purchasing an asset is required, in order to determine how much of the inevitable nonuse depreciation is incurred for a business purpose and is, therefore, allowable as a deduction.[6] As a separate matter, it is still necessary to determine the ratio of business (or profit-related) use to other (personal) uses of the asset, in order determine the use depreciation component of allowable depreciation.

I recognize the potential difficulty of bifurcating the depreciation analysis in the manner suggested. Presupposed by that scheme is some means of determining how much of an asset's potentially allowable depreciation ought to be attributed to use depreciation and how much to nonuse

---

[5] When an asset is placed in service, the owner ordinarily is aware that such asset will decline in value as time passes, even if not used. Thus, the decision to incur nonuse depreciation is made at the outset, independent of whatever use of the asset is later made. Thus, if an asset is placed in service with the intent of using it solely for business, the nonuse depreciation is incurred wholly for a business purpose, and ought to be deductible in its entirety, even if for some reason that asset never actually is used for a business purpose (such as fire fighting equipment if no fire occurs).

[6] Of course, the nonuse depreciation is only inevitable if the taxpayer continues to hold the asset; if the asset is sold, taxpayer, obviously, would not incur any further depreciation. Thus, it would be more accurate, particularly in years subsequent to placing the asset in service, to consider why the asset is kept and maintained by the taxpayer, since it is that motivation that would explain why any subsequent nonuse depreciation is incurred. For simplicity's sake, we operate here under the assumption that the motive for placing the asset in service and the motive for maintaining the asset are the same.

depreciation. Yet that task hardly seems insurmountable.[7] In any event, we ought to take the proper theoretical approach in addressing the problem. If concessions must be made to the practical difficulties of employing that approach, such concessions can be made at a later time as circumstances dictate.

In the case at hand, the majority opinion sheds little light on the question of why petitioner purchased the plane. Unenthusiastically, I conclude that petitioner in this case probably incurred use depreciation and nonuse depreciation in the same proportion. Thus, I would in this case reach the same result as the majority, since the distinction between use depreciation and nonuse depreciation does not come into play. I cannot join in the majority opinion, however, because, their rationale would not take such distinction into account, even in an appropriate case.

Another potential allocation that the majority has declined to address is that between the portion of the asset used for business and the portion used for personal gratification. See *International Artists, Ltd. v. Commissioner*, 55 T.C. 94 (1970) (depreciation deduction allowed to the extent premises were used for business purposes and disallowed to the extent used for personal purposes). If, for example, petitioner had bought a 747 with a jacuzzi and game room, instead of an apparently unremarkable six-seater, it might well be that—even if the plane had been flown only on business flights—a substantial portion of the depreciation would be attributable to personal use. If such were the case, the cost above that reasonably required for business purposes would have been incurred solely for personal reasons and, hence, would not give rise to a depreciable basis for property used in a trade or business. Compare sec. 167(a) with sec. 262.

---

[7]Expert testimony or other evidence might be obtained, demonstrating how much more an asset might sell for if it had been unused for a particular period of time, as opposed to if it had not only been unused during that period of time but had been manufactured immediately thereafter, thereby being undiminished neither by use nor the passage of time. Consider, for example, an automobile made in year 0 and driven for 30,000 miles in that year, which sells for $10,000 on the first day of year one. If it were shown that such automobile would then sell for $12,000 if it had not been driven at all, and that such automobile would sell for $15,000 if it had been made in year 1 instead of year 0 (in addition to not having been driven), then the ratio of use depreciation to nonuse depreciation would be 2 to 3: 60 percent of the total depreciation would be attributable to nonuse.

In this case, it has not been suggested that the airplane purchased by petitioner was any larger or more luxurious than reasonably necessary, and the majority opinion would seem to suggest that such is not the case.[8] I would therefore conclude that such allocation is here unnecessary, but ought to be considered in an appropriate case.

Before closing, I would venture a brief comment on the dissents of Judges Jacobs and Parr. Judge Jacobs concludes that the costs in question must be personal to the petitioner because Intel did not expect or require him to incur them and, consequently, they were voluntary. Although Judge Jacobs may be right in his conclusion that the costs constitute a nondeductible personal expenditure of petitioner's, he must first consider whether the costs were incurred in petitioner's trade or business of being an employee apart from Intel's expectations or requirements. That incurring the costs was not expected or required by Intel may be indicative of whether such costs were incurred in petitioner's trade or business, but it is not determinative. See *Heineman v. Commissioner*, 82 T.C. 538 (1984). Clearly, an employee may voluntarily incur deductible costs in attending a convention or meeting, so long as she is benefiting or advancing the interests or her trade or business by such attendance. Sec. 1.162-2(d), Income Tax Regs. That same point is pertinent to Judge Parr's additional reasons for dissenting.

For the foregoing reasons, I concur in the result reached by the majority.

---

JACOBS, *J.*, dissenting: The majority concluded that Robert N. Noyce (petitioner) was entitled to deductions for depreciation and expenses attributable to the use of his private airplane in his employment as vice chairman of the board of directors of Intel Corp. (Intel). I would conclude otherwise.

---

[8]Although the allocation in *International Artists, Ltd. v. Commissioner*, 55 T.C. 94 (1970), was made on the basis of space, the controlling concept is broader: no expense beyond that reasonably necessary for a business purpose may be deducted. Sec. 262. Thus, if taxpayer in this case had purchased, for example, a "gold-plated" six-seater, a large portion of that expense, including depreciation, would be unrelated to any business purpose and, consequently, would not be deductible.

It is well established that if an employee voluntarily pays his corporate employer's obligation, he cannot deduct the expense on his personal return. *Noland v. Commissioner,* 269 F.2d 108, 111 (4th Cir. 1959), affg. a Memorandum Opinion of this Court. As the circuit court stated in *Noland:*

When the corporation, reimbursing its officers and employees for direct expense incurred in furthering its business, does not reimburse an officer for particular expense, that expense prima facie is personal, either because it was voluntarily assumed or because it did not arise directly out of the exigencies of the business of the corporation. [269 F.2d at 113.]

However, if the employer requires or expects the employee to incur the expense without the employer's reimbursement, then the expense may be deductible. *Stolk v. Commissioner,* 40 T.C. 345, 357 (1963), affd. 326 F.2d 760 (2d Cir. 1964).

The majority concluded that petitioner's use of his own airplane and his payment of those expenses did not constitute the voluntary assumption of Intel's obligations. The majority based this conclusion on its finding that Intel expected petitioner, as an officer, to incur and pay travel expenses in excess of the amounts reimbursable under Intel's written reimbursement policy. The majority failed to find, however, that Intel required or expected its officers to use their own airplanes for business travel. In my opinion, such a finding was necessary in order for the majority to reach its conclusion.

Intel's written reimbursement policy, upon which the majority relied, consisted of a letter, dated August 4, 1980 (Intel's reimbursement policy), from Roger Borovoy, who was the general counsel, vice president, and secretary of Intel, to Andrew Grove (Dr. Grove), Intel's president, which stated:

RE: Intel Miscellaneous Expense Reimbursement Policy for Intel Officers

It is Intel's policy not to reimburse officers for certain kinds of expenses. Even though we recognize that the officer incurs these expenses for the benefit of Intel, we consider either the amount too small or the type of expense to be inappropriate for reimbursement considering the salary and other remuneration an Intel officer receives.

Examples of such expenses are purchases of drinks for Intel employees or others at company-related functions or at professional meetings. Whereas we do reimburse mileage for long trips, we discourage officers from

submitting mileage for car trips between Intel facilities in the Bay Area which are dispersed between Santa Cruz, Sunnyvale, Santa Clara, Mountain View and Livermore.

We also discourage officers from submitting expense reports for business entertaining at home, and for miscellaneous business lunches with Intel employees (even though the purpose of the lunch was entirely to discuss Intel business). Similarly, occasional gifts to secretaries and other employees, while essential for harmony in the work environment, are not reimbursed by the company.

While we feel it is beneficial to our officers to fly first class in order to get more work done on the plane, we have a policy of not reimbursing the additional costs for such travel.

In my opinion, Intel's reimbursement policy is insufficient to support a finding that Intel required or expected its officers to use their own airplanes for business travel, for the following reasons.

First, Intel's reimbursement policy did not expressly address Intel's requirements or expectations regarding its officers' use of their own airplanes. Rather, such policy stated only that flying first class was beneficial in that it permitted Intel's officers to get more work done on the airplane.

Second, the stated rationale for not reimbursing certain expenses was that Intel considered such expenses too small or inappropriate for reimbursement, considering the amount of remuneration received by its officers. Listed examples of such expenses were drinks at Intel-related functions and at professional meetings, local car trips, business entertaining at home, lunches with Intel employees, secretarial gifts, and the additional cost of first class travel. The listed examples involved *minimal* expenses. Petitioner's expense of using his own airplane was not minimal.

Third, Dr. Grove testified that Intel did not expect its officers to use private airplanes for business travel. In response to the Court's inquiry as to what would happen if Intel demanded that an employee use a private airplane and the employee could not afford one, Dr. Grove answered that Intel would expect the employee either to fly on a commercial airplane and take longer to travel or to forgo taking that particular trip, as follows:

THE COURT: If the corporation wanted— was going to demand someone to travel and utilize their time in the best interests of the company, and that corporate demand would have required a private plane, would the corporation agree to reimburse the individual for the private plane?

THE WITNESS: Someone other than Dr. Noyce, an ordinary person?

THE COURT: Your general policy?

THE WITNESS: No, well, the policy was pretty well set as I testified. In many of these instances, it wasn't that you couldn't get from here to there. It was just that you couldn't get from here to there in a particular time, and, therefore, Dr. Noyce would have had to take an extra day.

THE COURT: Well, if it was in the interest of the—of Intel to conserve the employee's time, and the employee said, "I just, you know, I want reimbursement for it if—you know, because otherwise you're gonna lose money," what would the corporation policy be then?

THE WITNESS: I think the policy would be still the same. The consequences of starting on the road toward reimbursing people for these things would be that we would have to make judgments on top of judgments and exceptions on top of exceptions, and it's not a comfortable prospect. *So, if somebody can afford to pay the extra and make himself more efficient and is willing to handle it that way, he'll do it that way; if not, not.*

THE COURT: Well, I guess that's the question I am trying to elicit from—or the answer I am trying to elicit. You said if the employee can afford to do it. If the employee can't afford to do it because the expenses that the corporation would be requiring of the employee would exceed his salary—

THE WITNESS: Then we won't do it.

THE COURT: Then you would expect the employee to lose money?

THE WITNESS: No.

THE COURT: Oh, then you would reimburse him?

THE WITNESS: No, no, *he will take two days.*

THE COURT: Oh, then he'll take two days. That would be the corporate desire then.

THE WITNESS: *Or would not go on that particular trip.*
   [Emphasis added.]

While it is clear that Intel did not object to petitioner's using his private airplane while traveling on corporate business, the record does not support a finding that Intel required or expected its officers to use their own airplanes for business travel. Thus, I would conclude that petitioner's expenses in using his own airplane were personal.

Before closing, I feel compelled to respond to certain comments made by Judge Halpern in his concurrence. Judge Halpern states that Intel's failure to require or expect petitioner to use his own airplane for business travel was indicative, but not determinative, of whether petitioner's expenses were deductible. In support thereof, Judge Halpern notes that an employee may voluntarily incur deductible expenses in attending a convention or meeting, so long as he is benefiting or advancing the interests of his trade or business by such attendance. Sec. 1.162-2(d), Income Tax Regs.

I recognize that an employee may deduct an ordinary and necessary expense incurred in connection with his trade or business of earning a salary provided that the expense had "a direct bearing on the amount of his compensation or his chances for advancement." *Walliser v. Commissioner*, 72 T.C. 433, 437 (1979). In *Westerman v. Commissioner*, 55 T.C. 478 (1970), we held that the taxpayer's expenses of using his private airplane for business travel were not deductible because such expenses were voluntarily incurred *and* the airplane was not used by the taxpayer in the hope of receiving additional reimbursement:

> As we have noted above, there is no evidence in this case to suggest that petitioner acted other than voluntarily, or that he acted in the hope of receiving any more reimbursement than that which he actually received. Moreover, the mere fact that the company may have benefited from the expenditures incurred by petitioner does not strengthen his position since it is a well-established rule that, in absence of a binding obligation, expenses incurred by one taxpayer for the benefit of another may not be deducted by the former. [*Westerman v. Commissioner*, 55 T.C. at 482. Citations omitted.]

Here, there was no finding that petitioner used his private airplane in the hope of increasing his salary or improving his chances for advancement.

In conclusion, I would hold that petitioner is not entitled to the claimed deduction for airplane expenses and depreciation under sections 162 and 167, respectively.

PARKER and PARR, *JJ.*, agree with this dissent.

---

PARR, *J.*, dissenting: In addition to the reasons set forth in the dissent of Judge Jacobs, with which I agree, I would also find that use of petitioner's private plane "did not arise directly out of the exigencies of the business of the corporation." *Noland v. Commissioner*, 269 F.2d 108, 113 (4th Cir. 1959), affg. a Memorandum Opinion of this Court.

PARKER, *J.*, agrees with this dissent.