T.C. Memo. 2010-198


UNITED STATES TAX COURT


WILLIAM J. DUNN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 17290-06.            Filed September 13, 2010.


<u>Frank J. Yong</u> and <u>J. Ellsworth Summers, Jr.</u>, for

petitioner.[1]

<u>Jeffrey S. Luechtefeld</u>, for respondent.

---

[1]Petitioner was represented by <u>Elizabeth Opalka</u> when he
filed his petition.  On Jan. 3, 2007, <u>Donald W. Wallis</u> was
substituted for Ms. Opalka as counsel for petitioner.  On Sept.
21, 2009, <u>Frank J. Yong</u> was substituted for Mr. Wallis as counsel
for petitioner.

MEMORANDUM FINDINGS OF FACT AND OPINION

THORNTON, Judge:  Respondent determined the following deficiencies in and penalties on petitioner's Federal income taxes:

| Year | Deficiency | Accuracy-Related Penalty Sec. 6662(a) |
|------|-----------|---------------------------------------|
| 2002 | $177,658 | $35,532 |
| 2003 | 140,820 | 28,164 |
| 2004 | 192,463 | 38,493 |

The issues for decision are:  (1) Whether petitioner is entitled to deduct expenses, mostly relating to airplane rentals, use, and maintenance, incurred by his wholly owned S corporation, Dunn Property Management, Inc. (DPM); (2) whether petitioner's pass-through losses from DPM and his single-member limited liability company, Dunn Equipment Leasing, L.L.C. (DEL), are subject to the passive activity loss restrictions of section 469; and (3) whether petitioner is liable for a section 6662(a) accuracy-related penalty for each year at issue.[2]

FINDINGS OF FACT

The parties have stipulated some facts, which we so find. When he petitioned the Court, petitioner resided in Florida.

---

[2]All section references are to the Internal Revenue Code (Code) in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

A.    Petitioner's Background

Petitioner is a 1976 graduate of the U.S. Air Force Academy and a 1980 graduate of Georgetown University Medical School. After serving some years as an Air Force flight surgeon, in 1988 he left active duty for the private practice of ophthalmology in Bangor, Maine. While working and living there with his family, he commuted in his private plane to Cleveland, Ohio, for a fellowship program in retina and vitreous surgery. Since 1991 he has been employed as a retinologist by the Florida Retina Institute, P.A. (FRI), a Florida professional corporation of which he is a vice president and shareholder.

FRI has a number of offices throughout northeast Florida and Georgia. Petitioner's medical practice is concentrated primarily in FRI's Daytona Beach office, which is in the general vicinity of his residence, and in Palm Coast, a short distance away. Petitioner typically works at FRI about 4-1/2 days each week and takes 6 to 8 weeks of vacation each year.

In addition to practicing medicine with FRI, petitioner participates in drug treatment studies for two major drug companies and serves on their advisory boards. Sometimes he travels to Miami or Atlanta to participate in these advisory boards. These companies pay petitioner consultant's fees and reimburse his travel expenses, typically on the basis of airline coach fares.

As described more fully below, during the years at issue petitioner also pursued aviation interests and real estate activities.

B.   Petitioner's Aviation Interests

Petitioner has been an aviation enthusiast since childhood. At age 14 he took his first flying lesson, and at age 17--the youngest age permitted by the Federal Aviation Administration (FAA)--he obtained his private pilot's license.  At the Air Force Academy he frequently flew military aircraft, and he completed a pilot indoctrination course.

In 1986 petitioner purchased his first airplane, a 1969 Aero Commander, which he flew for training and attending medical meetings.  In 1990 he traded up to a 1968 Mooney M20F, which he used for, among other things, attending medical meetings, commuting between Bangor, Maine, and Cleveland, Ohio, and taking his family on trips.  Because the Mooney was only a four-seater, he decided he needed a larger aircraft that would allow him to "take everybody on a trip" with greater safety, range, and speed. Consequently, in 1996 he traded up to a Cessna 414, which he used for, among other things, "flying my children around and business associates" and for trips from his Florida home to his Air Force reserve duty station in Washington, D.C.

In 2000 petitioner and his wife divorced.  She got the Cessna 414.  Petitioner decided to replace it with a Mitsubishi MU-2.

C.    Dunn Equipment Leasing, LLC

The Mitsubishi dealer referred petitioner to Louis M. Meiners, Jr. (Meiners), for advice about placing the new airplane in a holding company for asset and liability protection and to minimize State taxes.  Meiners was a certified public accountant (C.P.A.) and attorney with his own CPA firm in Indianapolis, Indiana (the Meiners firm), that specialized in tax-planning services.  Meiners was also president of Advocate Aircraft Taxation Consulting Co. (Advocate), an aviation consulting business with about 35 employees including CPAs, attorneys, paralegals, and support staff.  Advocate assists its clients in complying with Treasury regulations, FAA regulations, and State aviation-related regulations.

In 2000 petitioner engaged Advocate for advice about income taxes and about acquiring an aircraft in such a manner as to reduce sales or use taxes.  Following Advocate's advice, petitioner formed DEL, a limited liability company organized under Indiana law.  During the years at issue, petitioner was DEL's only member and employee.  DEL paid petitioner no salary.

D.    DEL's Purchase and Lease of the Mitsubishi to Petitioner

On or about July 1, 2000, DEL purchased a Mitsubishi MU-2 aircraft (the Mitsubishi) for about $630,000.  The purchase was financed by a loan that petitioner personally guaranteed.  On July 20, 2000, DEL, as owner, and petitioner, as operator, entered into an aircraft lease.  Pursuant to the lease, petitioner agreed to lease the Mitsubishi from DEL for a term ending December 31, 2004, and to make the following fixed rental payments:  $5,000 on July 20, 2000; $225,000 by August 19, 2000; and $5,000 at yearend 2000, 2001, 2002, and 2003.[3]  In addition, petitioner was responsible for all maintenance, service, and insurance on the Mitsubishi.

Petitioner's Florida residence is in a "fly-in/fly-out" community; i.e., one with a private airport for use by its residents.  An airplane hangar adjoins petitioner's residence.  The Mitsubishi was stored in this hangar.

E.    Dunn Property Management

In September 2001 petitioner incorporated DPM under the laws of Nevada.  The articles of incorporation list DPM's purpose as "PROPERTY MANAGEMENT".  Petitioner was DPM's sole officer,

---

[3]Petitioner testified that the $225,000 payment was made to "maximize state tax savings by doing a large prepayment of the lease payment".  Other than this testimony, there is no evidence that petitioner actually made any of the scheduled lease payments to DEL.

director, and shareholder. DPM elected for Federal income tax purposes to be treated as an S corporation.

F.   DEL's Lease of the Cessna Citation to Petitioner and DPM

In July 2002, in a reverse like-kind exchange facilitated by Advocate, DEL sold the Mitsubishi for about $545,000 and purchased a Cessna Citation aircraft (the Citation) for about $810,000. The purchase was financed with a loan that petitioner personally guaranteed. The Citation, like the Mitsubishi before it, was kept at petitioner's home in Florida.

The parties amended the preexisting aircraft lease between DEL and petitioner to substitute the Citation for the Mitsubishi. Also, on July 3, 2002, DEL, as owner, and DPM, as operator, entered into aircraft rental agreement, whereby DEL rented to DPM the nonexclusive right to use and operate the Citation. The DPM rental agreement stated that DPM was renting the Citation in furtherance of its "primary, non-transportation business and its employee benefits." DPM agreed to pay DEL rent of $175 per hour of flight time. In 2002, 2003, and 2004, DPM paid DEL aggregate rents of $54,400, $26,968, and $26,058, respectively. DPM also paid costs of using and maintaining the aircraft.

On November 1, 2004, DEL, as owner, and petitioner, as operator, entered into another rental agreement whereby DEL

granted petitioner nonexclusive rights to use and operate the Citation for a rental rate of $700 per hour of flight time.[4]

G.   Real Estate Owned by Petitioner Directly

During the years at issue petitioner owned in his own name, in addition to his Florida residence, interests in the following three real properties.

1.   Mountain Air Country Club Residence

In 1996 petitioner and his wife purchased this residential unit for about $380,000.  It is near Burnsville, North Carolina, in Mountain Air Country Club, an exclusive "fly-in/fly-out" community with its own landing strip and amenities such as golf, swimming, and tennis.  Pursuant to his divorce agreement in 2000, petitioner gained outright ownership of the property.  Petitioner typically used the property about six to eight times each year with family and friends.  Generally, he and his family or friends would fly there in the Mitsubishi or, later, in the Citation.

2.   Mountain Air Country Club Building Lot

In 2001 petitioner purchased this unimproved lot, also in Mountain Air Country Club, for $319,000.

3.   Miami Beach Condominium

In 2004 petitioner and his girlfriend purchased this property for $539,500.  She lived in the condominium while

---

[4]Apart from petitioner's testimony, there is no evidence that petitioner paid DEL such rents in 2004.

attending school in Miami.  Petitioner would visit using the Citation.

H.   Property Management Agreement Between DPM and Petitioner

On January 1, 2003, DPM and petitioner entered into an asset management agreement, which stated that petitioner retained DPM to manage designated assets for annual compensation calculated as the sum of 1 percent of the asset value of non-income-producing properties and 10 percent of the income on income-producing properties.  The annual payment was due no later than June 30 of the year following the year in which the management services were rendered.[5]  The asset management agreement indicates that it covers petitioner's two North Carolina country club properties.

I.   Real Property Owned by DPM

During the years at issue, DPM purchased ownership interests in the following four real properties, all of which it still possessed at the end of 2004.

1.   Ormond Beach, Florida, Apartment

In May 2002 DPM purchased this property for $72,500.  For an undisclosed period during the years at issue, DPM leased this apartment to tenants for $875 per month under a monthly rental agreement.  DPM employed a property management company to collect

---

[5]The record indicates that in May 2004 petitioner wrote DPM a $15,000 check for 2003 management fees.  The record does not indicate whether petitioner paid DPM any management fees for 2004.

rent and handle day-to-day management duties and routine maintenance. DPM paid the property management company 10 percent of the rental income generated by the property. Petitioner drove to the Ormond Beach property about once a month in his Lexus automobile, which DPM leased from him.

2. Key Largo, Florida, Condominium

In August 2002 DPM purchased this condominium for $749,900. The property includes amenities such as a pool, a spa, tennis courts, and a deepwater marina. DPM employed property management companies, which marketed the property for rent, collected the rent for the property, and enforced the rental agreements with tenants. The property managers were authorized to handle minor repairs, but DPM handled major repairs. The property managers were also responsible for day-to-day duties such as changing linens, booking reservations, and handling the arrival and departure of guests. For its services DPM paid the property management companies 30 to 40 percent of total rental revenues.

Petitioner flew to the Key Largo property four to six times each year in the Citation. According to his testimony, he would engage in "global oversight" of the property to make sure it was being maintained and marketed according to the management agreements. On these visits, which typically lasted from Friday night through Sunday night, he would stay in DPM's condominium if

it was vacant.  Otherwise he would stay in another unit on the property for a discounted rate.

### 3.  Lake Mary, Florida, Property

In June 2003 DPM and one of petitioner's professional colleagues purchased, as 50-50 coowners, an unimproved parcel of land in Lake Mary, Florida, adjacent to one of FRI's properties. Petitioner visited the property four to six times each year in his Lexus automobile, which DPM leased from him.

### 4.  Telluride, Colorado, Condominium

In June 2004 DPM purchased this unit in a resort hotel with amenities such as ski-in/ski-out access, a spa, restaurants, a swimming pool, and a gym.  DPM engaged a property management company which handled day-to-day duties such as changing the linens, housekeeping, marketing the property for rent, booking reservations, and collecting rent.  As payment for its services DPM paid the property management company 50 percent of total rental revenues.  DPM's responsibilities for the property included making decisions regarding the marketing, occasionally inspecting the property, and staying apprised of the current real estate market.  In 2004 petitioner flew to this property twice in the Citation.

## J.  Tax Reporting

The Meiners firm prepared DPM's Form 1120S, U.S. Income Tax Return for an S Corporation, for each year at issue.  On these

returns DPM reported net losses from rental real estate activities (hereinafter sometimes referred to as rental losses) and, separately, net losses from nonrental activities, which it labeled "ordinary" income losses (hereinafter sometimes referred to as nonrental losses), as follows:

| Year | Nonrental Losses[1] | Rental Losses[2] |
|------|------|------|
| 2002 | $173,912 | $36,123 |
| 2003 | 150,478 | 65,393 |
| 2004 | 160,502 | 141,872 |

[1]In calculating these nonrental losses, DPM reported no gross receipts for 2002 or 2003. For 2004 DPM reported gross receipts of $15,000, representing "management fees" that petitioner paid to DPM. In calculating its nonrental losses, DPM reported deductions as shown in appendix A. Most of these deductions appear to be aviation related.

[2]In calculating these rental losses, DPM claimed deductions shown in appendix B.

On Schedules K-1, Shareholder's Share of Income, Credits, Deductions, etc., DPM reported these losses as passing through to petitioner.

CPA firms other than the Meiners firm prepared petitioner's Forms 1040, U.S. Individual Income Tax Return, for the years at issue, although the Meiners firm helped prepare certain schedules relating to airplane expenses and also prepared grouping elections. For 2002, on Schedule E, Supplemental Income and Loss, of his Form 1040 petitioner claimed the aggregate $210,035 of DPM pass-through losses (i.e., $173,912 of nonrental losses plus $36,123 of rental losses) as nonpassive losses which he

offset against other income, principally wages, to report adjusted gross income of $897,451.  For 2003 and 2004 on Schedules E petitioner claimed the DPM pass-through nonrental losses as nonpassive losses, which he offset against other income, principally wages, to report adjusted gross income of $793,448 for 2003 and $702,654 for 2004. For 2003 and 2004 he treated the DPM rental losses as passive losses and deducted them only to the extent of other real estate rental income that he received from FRI ($5,808 in 2003 and $3,995 in 2004).

On Schedules C, Profit or Loss From Business, attached to his Forms 1040, petitioner also claimed net losses from DEL as follows:

|  | 2002 | 2003 | 2004 |
|---|---|---|---|
| Expenses: |  |  |  |
| Depreciation | $174,701 | $167,313 | $286,863 |
| Insurance | 36,600 | -- | -- |
| Interest | 17,114 | 31,601 | 28,051 |
| Hangar | 1,100 | -- | -- |
| Taxes and licenses | -- | 28 | 603 |
| Legal and professional services | -- | 5,000 | 5,000 |
| Total expenses | 229,515 | 203,942 | 320,517 |
| Gross receipts | 54,400 | 26,968 | 26,058 |
| Net loss | 175,115 | 176,974 | 294,459 |

The Meiners firm provided petitioner's tax return preparer the information used to prepare the Schedules C relating to DEL's leasing activities.

Petitioner, on his 2003 Form 1040, and DPM, on its 2003 and 2004 Forms 1120S, elected to group the activities of DPM and DEL for purposes of the section 469 passive activity loss limitations

and for purposes of section 183.[6]  The Meiners firm prepared these grouping elections for petitioner.

K.   Notice of Deficiency

In the notice of deficiency, respondent disallowed the DPM pass-through losses and petitioner's DEL Schedule C losses on grounds that it had not been established that any amounts were incurred and paid for ordinary and necessary business purposes or in an activity entered into for profit or with respect to property held for the production of income.  Alternatively, respondent determined that DPM's pass-through losses and the DEL Schedule C losses were attributable to passive activities and subject to the section 469 limitations.  More particularly, respondent made separate adjustments for DPM's rental and nonrental pass-through losses and for the DEL Schedule C losses as more fully described below.

1.   DPM Rental Pass-Through Losses

Respondent disallowed in their entirety the DPM rental losses that petitioner claimed ($36,123 for 2002, $5,808 for 2003, and $3,995 for 2004) and determined that petitioner should have reported pass-through rental income equal to DPM's gross rents ($4,361 for 2002, $28,752 for 2003, and $29,269 for 2004).

---

[6]As related to the sec. 469 grouping, the elections on these various returns stated identically:  "Taxpayer hereby elects to group equipment rental activity identified as Dunn Equipment Leasing, Inc., with Dunn Property Management, Inc., its lessee in the original grouping as an appropriate economic unit pursuant to Regulation § 1.469-4(d)(1)(C)."

As a result of these adjustments, respondent determined that petitioner's taxable income should be increased $40,484 for 2002, $34,560 for 2003, and $33,264 for 2004; i.e., the sum of the disallowed losses and the unreported gross rents. For 2002 respondent further determined that the DPM pass-through rental losses, which petitioner had claimed as nonpassive losses on his 2002 Form 1040, should be recharacterized as passive losses for purposes of section 469. For 2003 and 2004 respondent determined that no such recharacterization was required, because petitioner's 2003 and 2004 Forms 1040 properly showed the DPM pass-through rental losses as passive.

2. DPM Nonrental Losses

Respondent disallowed in their entirety the DPM nonrental pass-through losses ($173,912 for 2002, $150,478 for 2003, and $160,502 for 2004) and determined that petitioner should have reported as income the gross amount of DPM's nonrental income (zero for 2002 and 2003, and $15,000 for 2004). As a result of these adjustments, respondent determined that petitioner's taxable income should be increased by $173,912 for 2002, $150,478 for 2003, and $175,502 for 2004; i.e., the sum of the disallowed losses and the unreported gross income. Respondent further determined that all the DPM nonrental pass-through losses were subject to the section 469 passive activity loss limitations.

3. DEL Schedule C Losses

On grounds that petitioner had failed to establish that any amounts were paid for ordinary and necessary business purposes or in an activity entered into for profit or with respect to property held for the production of income, respondent disallowed in their entirety the Schedule C business expense deductions that petitioner claimed with respect to his DEL activity, resulting in corresponding increases to his taxable income ($229,515 for 2002, $203,942 for 2003, and $320,517 for 2004). Respondent further determined that any profits or losses allowable with respect to his DEL activity were attributable to a passive activity.

4. Section 6662(a) Penalty

Respondent determined that for each year at issue petitioner was liable for a section 6662(a) accuracy-related penalty for substantial understatement of income tax.

OPINION

I. Introduction

Petitioner, a retinologist and a licensed pilot, claims substantial losses attributable to airplanes that DEL, his single-member LLC, owned and that he flew, allegedly on behalf of DPM, his wholly owned S corporation. More particularly, petitioner claims Schedule C losses from DEL's activity of leasing the airplanes to DPM and petitioner. Petitioner also claims substantial pass-through losses from DPM. They comprise:

(1) Rental losses, attributable to DPM's expenses of renting real estate that it owned, and (2) nonrental losses, attributable mainly to DPM's leasing, using, and maintaining at least one of the airplanes.

As previously described, in the notice of deficiency respondent disallowed all the Schedule C deductions for DEL business expenses and DPM pass-through losses on various alternative grounds. In this proceeding, respondent has modified his positions. Respondent now concedes that DEL and DPM paid the disputed expenses. Respondent continues to maintain, however, as he did in the notice of deficiency, that the aviation-related expenses giving rise to the DPM nonrental losses were not ordinary and necessary expenses incurred in a trade or business. He no longer presses this contention, however, with regard to the DPM rental activity or with regard to DEL's activity. Respondent continues to assert that DEL was not engaged in an activity for profit, but he no longer presses this argument with regard to DPM. As in the notice of deficiency, respondent maintains that any allowable losses from either petitioner's DEL activity or his DPM activities are subject to the passive activity loss restrictions of section 469. But respondent now concedes the adjustments of $34,560 and $33,264 for 2003 and 2004, respectively, with respect to the DPM pass-through losses attributable to its rental activities, noting that petitioner

correctly reported these pass-through losses as passive for 2003 and 2004.[7]

II. Burden of Proof

The taxpayer generally bears the burden of proving the Commissioner's determinations erroneous. Rule 142(a). In particular, the taxpayer bears the burden of substantiating the amount and purpose of each item claimed as a deduction. See Higbee v. Commissioner, 116 T.C. 438, 440 (2001); Hradesky v. Commissioner, 65 T.C. 87, 90 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976).

Section 7491(a)(1) provides that if, in any court proceeding, a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the taxpayer's proper tax liability, the Commissioner shall have the burden of proof with respect to that issue. Credible evidence is evidence the Court would find sufficient upon which to base a decision on the issue in the taxpayer's favor, absent any contrary evidence. See Higbee v. Commissioner, supra at 442. Section 7491(a)(1) applies, however, only if the taxpayer complies with all

---

[7]The notice of deficiency similarly determined that petitioner had correctly reported the 2003 and 2004 DPM rental losses as passive but nevertheless determined an increase in petitioner's tax liabilities resulting from the disallowance of the DPM rental losses for failure to establish that they represented ordinary and necessary business or investment expenses. In conceding this issue, respondent has waived any issue as to whether the DPM rental expenses should be disallowed entirely.

substantiation and recordkeeping requirements under the Code and cooperates with the Commissioner's reasonable requests for witnesses, information, documents, meetings, and interviews. Sec. 7491(a)(2)(A) and (B).

As discussed infra, our decision turns primarily on two issues: (1) Whether DPM's airplane expenses were ordinary and necessary; and (2) whether petitioner's DPM and DEL pass-through losses are subject to the passive activity loss restrictions of section 469. As to the first issue, respondent concedes that petitioner has substantiated the amounts of the disputed expenses but contends, and we agree, that petitioner has failed to substantiate business purposes independent of substantial personal purposes for the flights. Whether petitioner's failure in this regard be viewed as failure to satisfy the substantiation prerequisite of section 7491(a)(2)(A) or as failure to present credible evidence sufficient for the Court to render a decision in his favor, the result is the same--the burden of proof remains with petitioner.

The passive loss issue involves mixed questions of law and fact. With respect to critical factual issues, particularly as to the number of hours petitioner might have engaged in his DPM and DEL activities, petitioner has, again, failed to substantiate these matters or to present credible evidence sufficient for the

Court to render a decision in his favor.  The burden of proof as to this issue also remains with petitioner.

Respondent bears the burden of production with respect to penalties.  See sec. 7491(c).  We discuss this matter infra.

## III.  Deductibility of DPM's Airplane Expenses

### A.  The Parties' Contentions

Respondent contends that the DPM nonrental losses (i.e., the losses attributable to DPM's activities other than renting its real estate properties) are nondeductible under section 162(a) because they are not attributable to the conduct of any trade or business.  Alternatively, respondent contends that the DPM nonrental losses are nondeductible under either section 162(a) or section 212 because they do not represent ordinary and necessary business expenses but rather primarily personal expenses.[8]

Characterizing respondent's discussion of the trade or business requirement of section 162(a) as "inapposite" and thereby implicitly conceding that the DPM nonrental activity was not a trade or business, petitioner contends on brief that DPM's deduction of the disputed expenses was based not upon section 162(a) but upon section 212(2).[9]  Petitioner contends that DPM's

---

[8]Respondent argues alternatively that even if DPM's aircraft-related expenses were ordinary and necessary business expenses, petitioner's deduction of these expenses would be limited by the sec. 469 passive activity loss limitations.  We address these arguments in pt. IV, infra.

[9]Petitioner's contentions are inconsistent with the manner
(continued...)

main activity was holding real estate for appreciation.  He contends that the disputed expenses represent ordinary and necessary travel expenses that were integral to DPM's managing, conserving, and maintaining properties that it owned during the years at issue and were also necessary for DPM's investigating prospective investment properties.  He contends that his need to travel on DPM's behalf by private plane was "obvious" because otherwise it would have been inefficient or infeasible for him to pursue his far-flung real estate investment activities while at the same time conducting his full-time medical practice.  Thus, he contends, the disputed expenses are deductible under section 212(2) as DPM's ordinary and necessary expenses.

B.  General Legal Principles

An eligible small business corporation that elects S corporation status is generally exempt from corporate income tax. See sec. 1363(a).  Instead, the S corporation's shareholders must

---

[9](...continued)
in which he treated the disputed expenses on his tax returns for the years at issue.  On his returns petitioner treated these items not as miscellaneous itemized deductions under sec. 212 but as reductions in arriving at adjusted gross income, presumably pursuant to sec. 162(a).  If we were to agree with petitioner's argument that the disputed expenses are deductible as miscellaneous itemized deductions under sec. 212 (which we do not), collateral computational effects (i.e., subjecting them under sec. 67(a) to the 2-percent floor of adjusted gross income and under sec. 68 to reduction for high-income individuals) would likely reduce the value of these miscellaneous itemized deductions to petitioner.  See infra text accompanying note 11. Because we conclude, for reasons discussed infra, that the disputed expenses are not ordinary and necessary, we need not consider these issues further.

report pro rata shares of the S corporation's taxable income, losses, deductions, and credits. Sec. 1366(a)(1)(A); sec. 1.1366-1(a), Income Tax Regs.[10] An S corporation item generally retains its character for the shareholder. Sec. 1366(b). With certain exceptions, an S corporation's taxable income is computed in the same manner as an individual's. Sec. 1363(b).

Unless expressly provided in the Code, no deduction is allowed for personal expenses. Sec. 262(a). Section 162(a) allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". Section 212(1) and (2) provides that an individual may deduct ordinary and necessary expenses paid or incurred for the production or collection of income or for the management, conservation, or maintenance of property held for the production of income.

Generally, sections 162(a) and 212 provide, with respect to the respective classes of activities to which they pertain, "coextensive" deductions. Trust of Bingham v. Commissioner, 325 U.S. 365, 374 (1945) (discussing statutory predecessors of sections 162(a) and 212(1) and (2)). In some circumstances, however, a section 212 deduction might be less beneficial than a

---

[10]The shareholder may not take into account S corporation losses and deductions for any taxable year in excess of the shareholder's adjusted basis in the S corporation's stock and debt. Sec. 1366(d)(1). Respondent does not contend that petitioner's basis in DPM was insufficient to support the pass-through losses in question.

section 162(a) deduction.  For instance, as miscellaneous itemized deductions, section 212 deductions, unlike section 162(a) deductions, are deductible only to the extent they exceed 2 percent of the taxpayer's adjusted gross income and for high-income individuals are subject to reduction.[11]  Secs. 67(a), 68; see 1 Bittker & Lokken, Federal Taxation of Income, Estates and Gifts, par. 20.5.1, at 20-115 through 20-117 (3d ed. 1999) (discussing various other circumstances in which deductibility under section 212 may be less beneficial than under section 162(a)).

To be deductible under either section 162(a) or 212, expenses must be ordinary and necessary.  Under the section 212 regulations, this means that the expenses must be "reasonable in amount and must bear a reasonable and proximate relation to the production or collection of taxable income or to the management, conservation, or maintenance of property held for the production of income."  Sec. 1.212-1(d), Income Tax Regs.; see Trust of

---

[11]For reasons such as these, to effect flowthrough of deductions from an S corporation to a shareholder, itemized deductions under sec. 212, unlike deductions under sec. 162(a), must be separately stated rather than aggregated with the S corporation's other items of income, deductions, losses, and credits.  See secs. 1363(b)(2) (disallowing in the computation of an S corporation's taxable income deductions referred to in sec. 703(a)(2), which includes, in subpar. (E) thereof, itemized deductions under sec. 212), 1366(a)(1); sec. 1.1366-1(a)(2)(vi), Income Tax Regs.  The character of such separately stated items is determined in the hands of the shareholder as if they were "incurred in the same manner as incurred by the corporation." Sec. 1366(b).

Bingham v. Commissioner, supra at 373 (articulating a substantially identical standard with respect to the statutory predecessor of section 212).  If substantial business and personal motives exist for owning and maintaining property, it is necessary to allocate the expenditures.[12]  Internatl. Artists, Ltd. v. Commissioner, 55 T.C. 94, 105 (1970); Richardson v. Commissioner, T.C. Memo. 1996-368.

C.  Analysis

During 2002 and 2003, of the three real properties in which DPM held ownership interests, only one--the Key Largo condominium--was a destination to which petitioner flew himself in one of the airplanes in question.  He made these trips, he testified, four to six times a year on DPM's behalf, staying weekends.  In 2004 DPM also acquired a resort property in Telluride, Colorado; in 2004 petitioner flew there twice and

---

[12]Pursuant to sec. 274(d)(4), stringent substantiation is required for deductions with respect to "listed property", which includes passenger automobiles and "any other property used as a means of transportation"; e.g., airplanes.  Sec. 280F(d)(4)(A)(i) and (ii).  These rules require the taxpayer to maintain adequate records or sufficient corroborating evidence to establish each element of an expenditure, including business purpose.  See sec. 274(d); sec. 1.274-5T(b)(6), (c)(2)(i), Temporary Income Tax Regs., 50 Fed. Reg. 46016, 46017 (Nov. 6, 1985).  If the listed property is used for both personal and business purposes, no deduction is allowed unless the taxpayer establishes the business purpose.  Kinney v. Commissioner, T.C. Memo. 2008-287; sec. 1.274-5T(b)(6)(i)(B), Temporary Income Tax Regs., 50 Fed. Reg. 46016 (Nov. 6, 1985).  Although these rules would seem germane to the deductibility of DPM's airplane expenses, respondent has not cited or relied upon the sec. 274(d) substantiation rules. Accordingly, we likewise do not rely upon them in our analysis.

stayed for periods undisclosed in the record.  For the years at issue DPM claimed airplane expenditures ranging from $150,478 to $175,502.[13]

Clearly, these large airplane expenditures were not wholly attributable to the approximately 20 flights that petitioner made during the years at issue to DPM's Key Largo and Telluride properties.  In fact, according to petitioner's flight logs, which are in evidence, during the years at issue petitioner made over 350 flights in the airplanes.[14]  He has offered into evidence a redacted version of his flight logs that, according to his testimony, omits "personal trips" and includes only "business trips".  These redacted flight logs show about 250 flights that

---

[13]Respondent characterizes these expenses as being "predominately related to petitioner's aircraft".  Appearing to agree with this characterization, petitioner states that "the bulk" of these expenses are expenses related to airplane travel. The disputed expenses appear to include some relatively small nonaviation items; e.g., "Auto and truck expense".  See app. A. On the basis of petitioner's testimony and in the absence of other evidence, we infer that "Auto and truck expense" includes the expense of DPM's purportedly leasing petitioner's Lexus from him, so that he could drive it, allegedly on DPM's behalf, to the Ormond Beach and Lake Mary, Fla., properties.  Petitioner has not advanced independent arguments with respect to such nonaviation items but, like respondent, has contented himself with treating all the disputed expenses as being aviation related.

[14]DPM reported as "Rent expense" $54,400, $27,607, and $32,058, for 2002, 2003, and 2004, respectively.  See app. A. Although the record is not explicit on this point, it would appear that these are the amounts that DPM paid DEL as rent for the airplanes.  The record does not establish the reasonableness of such rents between these related entities.  As discussed infra, it appears that a substantial portion of the rents represents petitioner's personal use of the airplanes.

he took in the airplanes.  According to petitioner's own reckoning, then, at least 100 of his flights were for personal purposes.  Insofar as we can tell from the record, however (and petitioner does not contend otherwise), all the flights, including those that petitioner concedes to have been personal, are included in the aviation expense deductions that DPM claimed for the years at issue.  The record does not reflect that petitioner reimbursed DPM for any of these flights.

Another problem brought to light by these flight logs is that petitioner is claiming as part of DPM's airplane expenditures the cost of 22 flights that he made between January 1 and June 16, 2002, in the Mitsubishi, before DEL acquired the Citation in July 2002.  DEL and DPM entered into the lease agreement for the Citation on July 3, 2002.  Insofar as the record shows, DEL never leased the Mitsubishi to DPM.  Petitioner has not explained why any of the Mitsubishi expenses represent expenses of DPM rather than of petitioner.

Furthermore, it appears that petitioner has counted as "business flights" numerous flights, both in the Mitsubishi and in the Citation, that he made to the North Carolina country club in which he owned a vacation home and a building lot.  In the flight logs the purpose of these flights is generally described, without elaboration, as "Inspect Property" or as "Training/Inspect Property".  Apparently, petitioner

characterizes these as business flights partly because of the asset management agreement whereby DPM purportedly agreed to manage these properties on petitioner's behalf. The asset management agreement, however, was executed on January 1, 2003, and so has no bearing on flights petitioner made before then. More fundamentally, we do not perceive any significant purpose, apart from hoped-for tax benefits, in petitioner's purportedly arranging for DPM to manage his properties. Because petitioner was the sole officer, director, and shareholder of DPM, which had no employees, this agreement was tantamount to petitioner's agreeing, for a fee, to "manage" his properties for himself. Nor are we impressed with petitioner's suggestion that he should be allowed to deduct the expenses of flying to his vacation home because he hoped someday to sell it at a profit.[15]

In the redacted flight logs the purpose of many of the so-called business trips is listed simply as "Training". For many years before forming DPM and DEL, petitioner had regularly taken training flights to acquire flying licenses and to satisfy insurance standards. We are unconvinced that the "Training" flights were not primarily for personal purposes.[16] See Noyce v.

---

[15]Similarly, we see no DPM-related purpose to a July 30, 2004, flight, included in petitioner's redacted flight logs, in which petitioner flew with his girlfriend and his daughter to make an offer on the Miami Beach condominium that he and his girlfriend would eventually coown in their own names.

[16]In some instances, the flight logs manifest personal
(continued...)

Commissioner, 97 T.C. 670, 693 (1991) (treating training flights as personal).

Indeed, we do not believe that even the 20 or so flights that petitioner made to two of the properties that DPM owned were devoid of substantial personal motivations. After all, these were resort properties managed by professional management companies. Although petitioner testified that he performed "global oversight" at these properties, his description of this activity ("looking at the big picture, taking care of maintenance items, et cetera, that type of thing") does not persuade us that any such activity would have much interfered with his personal motives for his frequent weekends at the Key Largo condominium or for his two trips to the Telluride, Colorado, condominium during 2004.

Petitioner suggests that in evaluating whether the disputed expenses were ordinary and necessary, we should take into account not only the airplane trips he made to the two properties that DPM owned but also the more numerous airplane trips he claims to have made to investigate other prospective real estate

---

[16](...continued) purposes for the "Training" flights. For instance, a "Training" trip to Miami, Fla., on Aug. 14, 2002, is described in the unredacted version of the flight logs as having the purpose of "pick up daughter". A "Training" trip to Chapel Hill, N.C., on Sept. 27, 2002, is described in the unredacted version of the flight logs as having the purpose of "visit Lisa". Even in instances where a personal purpose is not made manifest, however, we are not convinced that personal motives were absent.

investments, allegedly on DPM's behalf.  He has failed to substantiate, however, that any such investigatory expenses relating to new investment opportunities rather than to the maintenance of existing investments qualify for deduction under section 212.  See Bick v. Commissioner, T.C. Memo. 1978-390 (and cases cited therein).

In Noyce v. Commissioner, supra, this Court held that Intel Corp.'s vice chairman, a licensed pilot, was entitled to deduct unreimbursed expenses of using his private airplane in the course of his employment with Intel.  The Court held that these were ordinary and necessary expenses incurred in the taxpayer's trade or business as a corporate official, finding that he had not voluntarily assumed the travel expenses, that his official duties required extensive and frequent travel, that his access to the airplane enabled him to significantly reduce his travel time, that he traveled by aircraft only when there was business advantage in doing so, and that the cost of replicating his travel schedule and time savings via commercial charter carrier would have exceed the costs of operating his airplane.  Id. at 685-688; see also Richardson v. Commissioner, T.C. Memo. 1996-368 (holding that the taxpayer was entitled to deduct airplane expenses incurred by his S corporation as ordinary and necessary expenses that contributed to the efficiency and productivity of the corporation's trade or business).

Unlike the taxpayers in <u>Noyce</u> and <u>Richardson</u>, petitioner does not contend that the disputed expenses were incurred in the conduct of any trade or business.[17]  More fundamentally, unlike the taxpayers in <u>Noyce</u> and <u>Richardson</u>, petitioner has failed to identify business purposes independent of substantial personal purposes for any of the flights in question.[18]  Rather, the evidence convinces us that for all the flights in question petitioner had substantial personal motives emanating from his lifelong interest in flying airplanes.  From this perspective, this case bears some similarity to <u>Henry v. Commissioner</u>, 36 T.C. 879 (1961).  In that case, a lawyer sought to deduct, as ordinary and necessary business expenses, the costs of acquiring and maintaining his yacht.  He claimed that he used the yacht to

---

[17]Moreover, petitioner has not claimed, and the evidence does not suggest, that he incurred the disputed expenses in the conduct of his trade or business of being an employee of FRI. The evidence does not show that petitioner used the airplane as part of his FRI employment or that any such use would not have represented his voluntary assumption of FRI's expenses, rendering them nondeductible to him.  Cf. <u>Noyce v. Commissioner</u>, 97 T.C. 670, 683-685 (1991) (concluding that the taxpayer personally incurred airplane expenses pursuant to Intel's written travel reimbursement policy requiring its officers to incur certain expenses for Intel's benefit without reimbursement).

[18]In <u>Noyce v. Commissioner</u>, <u>supra</u> at 681-682, the taxpayer's personal use of the airplane was 45.6 hours out of a total 147.4 hours, and the taxpayer claimed no deduction for this personal use.  The Court in <u>Noyce</u> also disallowed expenses for flight hours attributable to maintenance, training, and delivery on the grounds that these flight hours did not represent business use. <u>Id.</u> at 693.  Similarly, in <u>Richardson v. Commissioner</u>, T.C. Memo. 1996-368, the taxpayer's use of the airplane is described as "minor", and the taxpayer paid the actual cost associated with this personal use.

promote his business.  In disallowing the expenses the Court

noted the taxpayer's strong personal interest in yachting and

stated:

> In determining that which is "necessary" to a
> taxpayer's trade or business, the taxpayer is
> ordinarily the best judge on the matter, and we would
> hesitate to substitute our own discretion for his with
> regard to whether an expenditure is "appropriate and
> helpful," in those cases in which he has decided to
> make the expenditure solely to serve the purposes of
> his business. * * * But where, as in this case, the
> expenditures may well have been made to further ends
> which are primarily personal, this ordinary constraint
> does not prevail; petitioner must show affirmatively
> that his expenses were "necessary" to the conduct of
> his professions. * * * We do not think petitioner has
> shown that the expenses of acquiring and maintaining a
> yacht were "necessary" to the conduct of his
> professions.  [Id. at 884.]

Petitioner has failed to show that the disputed expenses

were ordinary and necessary expenses of DPM rather than his

personal expenses.  Accordingly, petitioner is not entitled to

deduct the claimed DPM nonrental pass-through losses pursuant to

section 212 or otherwise.[19]

---

[19]On reply brief, petitioner appears to concede that some of
the flights for which he claimed deductions were personal and
states that "these expenses, at a minimum, would have to be
allocated based on the use".  He also acknowledges that "if it
were true" (and we find that it is true) that DPM deducted the
total airplane expenses without allocating any portions to
petitioner's personal use, this "oversight or error should be
corrected."  Petitioner suggests that this "oversight or error"
should be corrected "as part of the computations that will be
made under Rule 155(b) * * * in accordance with the findings and
conclusions of this Court."  We disagree.  In accordance with our
findings and conclusions supra, no allocation of the disputed
expenses is warranted.

IV.  Passive Activity Limitations

     A.  The Parties' Contentions

     Respondent contends that during the years at issue DPM's only activity was renting real estate and that DEL's only activity was leasing airplanes.  Accordingly, respondent contends that under section 469(c)(2) petitioner's activities with respect to DEL and the DPM rental activity were per se passive activities and his claimed losses therefrom are subject to the section 469(a) passive activity loss restrictions.[20]  Respondent further argues that whether or not these rental activities are deemed per se passive, all petitioner's DPM and DEL activities were in fact passive because petitioner failed to materially participate in them.

     Petitioner contends that all his activities--including his medical professional activities, his medical research activities, his real estate investment activities, and the ownership and use of airplanes--should be regarded as a "single activity" for purposes of section 469.  From this perspective, he suggests, DPM's rental activities were merely "incidental" to its investment activities, and DEL's airplane rental activities should be disregarded altogether, since "no one other than Petitioner ever used the aircraft in connection with any

_____

[20]As previously noted, respondent concedes the adjustments with respect to the 2003 and 2004 DPM rental losses, on the ground that petitioner correctly treated these losses as passive on his 2003 and 2004 returns.  See supra note 7.

activity."  Accordingly, he contends, neither DEL's nor DPM's activities should be treated as per se passive rental activities. He further contends that he meets the material participation test for these various activities, whether viewed separately or as a group, and that accordingly the disputed losses are not subject to the section 469 restrictions.

    B.  <u>General Legal Principles</u>

Section 469(a)(1) disallows any deduction for a "passive activity loss", defined generally as the amount each year by which the aggregate losses from all passive activities exceed aggregate income from all passive activities.[21]  Sec. 469(d)(1). Generally, a passive activity is one involving the conduct of a trade or business in which the taxpayer does not materially participate.  Sec. 469(c)(1).  Subject to certain exceptions, a "rental activity" is treated as a per se passive activity without regard to whether the taxpayer materially participates.  Sec. 469(c)(2), (4).  A "rental activity" is one in which payments are principally for the use of tangible property.  Sec. 469(j)(8).

Generally, one or more trade or business activities or rental activities may be treated as a single activity if the

---

[21]By its terms, sec. 469 applies to individuals and various specified entities but not to conduits such as partnerships and S corporations.  See sec. 469(a)(2).  For purposes of sec. 469, the character of each item of gross income and deduction allocated to a taxpayer from a partnership or S corporation is determined by reference to the taxpayer's participation in the activity.  Sec. 1.469-2T(e)(1), Income Tax Regs., 53 Fed. Reg. 5718 (Feb. 25, 1988).

activities constitute an appropriate economic unit for the measurement of gain or loss for purposes of section 469.  Sec. 1.469-4(c)(1), Income Tax Regs.  As an exception to this general rule, however, an activity involving the rental of real property and an activity involving the rental of personal property generally may not be treated as a single activity.  Sec. 1.469-4(d)(2), Income Tax Regs.

C.  Analysis

1.  Petitioner's Grouping Arguments

On their 2003 returns petitioner and DPM elected to group DPM's and DEL's activities for purposes of section 469.  Insofar as the record shows, no grouping election was made before 2003. And contrary to petitioner's assertions on brief, no election was ever made, for any year, to group these activities with his medical practice employment or his medical research activities. Indeed, such an election would have been inappropriate for a variety of reasons.

In the first instance, petitioner does not contend and the record does not show that during the years at issue his medical research activities constituted a "trade or business" so as to be eligible for grouping with his other activities under the regulations.[22]  See sec. 1.469-4(c)(1), Income Tax Regs.  As

---

[22]Although petitioner testified that he reported consultant's fees from his medical research activities as additional income on his tax returns, we find no such additional
(continued...)

previously discussed, we have also concluded that petitioner, by insisting that DPM has claimed its nonrental expenses under section 212 and by characterizing as "inapposite" respondent's complaint that DPM did not meet the trade or business requirement of section 162(a), has effectively conceded that DPM's nonrental activities did not constitute a trade or business during the years at issue. Accordingly, petitioner's medical research activities and DPM's nonrental activities are ineligible for grouping with petitioner's other activities.

But even if we were to assume, for the sake of argument, that all the activities which petitioner seeks to group constituted either trades or businesses or rental activities, we would nevertheless conclude that these activities do not constitute an "appropriate economic unit" within the meaning of the regulations. Id. The regulations provide that whether activities constitute an appropriate economic unit for grouping depends upon all the relevant facts and circumstances, with these five factors receiving the greatest weight:

> (i) Similarities and differences in types of trades or businesses;

---

[22](...continued)
income reported on his returns for the years at issue. Petitioner's generalized testimony about his medical research activities leaves us in doubt as to the exact periods during which he might have been involved in these activities. But even if we were to assume, for the sake of argument, that he was involved in these activities during the years at issue, the record does not establish that they would have constituted a trade or business.

        (ii) The extent of common control;

        (iii) The extent of common ownership;

        (iv) Geographical location; and

        (v) Interdependencies between or among the
    activities (for example, the extent to which the
    activities purchase or sell goods between or among
    themselves, involve products or services that are
    normally provided together, have the same customers,
    have the same employees, or are accounted for with a
    single set of books and records).  [Sec. 1.469-4(c)(2),
    Income Tax Regs.]

Petitioner conducted his medical practice as an employee of FRI.  Being an employee may be a trade or business.  Putoma Corp. v. Commissioner, 66 T.C. 652, 673 (1976), affd. 601 F.2d 734 (5th Cir. 1979).  Petitioner has made no showing, however, that his trade or business of being an employee of FRI or any putative trade or business involving his medical research satisfies any of these grouping factors, with the possible exception of the geographical factor.  It is not apparent to us that petitioner used the airplanes to any significant degree in his medical practice, based a short distance from his residence, or to what extent he might have used the airplanes in any medical research activities during the years at issue.  His central argument, as we understand it, is that using the airplanes was helpful to his medical employment and his medical research because it minimized the time he would lose from these activities while pursuing other activities, such as real estate activities (and, we infer, vacations).  But any such connection does not suffice to make his

various activities an "appropriate economic unit".  We reject petitioner's suggestion that all his activities should be grouped for purposes of section 469.[23]

2.  DEL's Rental Activity

Apart from his grouping argument, which we have rejected, petitioner has advanced no reason for us to conclude that DEL's activity was not in fact, as petitioner and DPM expressly characterized it in their grouping elections, an "equipment rental activity".  Petitioner has not shown that respondent erred in treating DEL's rental activity as per se passive under section 469(c)(2) and (4).  Consequently, we hold that the Schedule C losses petitioner claimed with respect to DEL's activities are subject to the passive activity loss limitations.[24]

_____

[23]Consequently, we also reject as without legal or factual basis petitioner's argument that "as a result of the grouping pursuant to the elections, it is appropriate to merge together, and to ignore the separateness of, the aircraft rental income received and the aircraft rental expense paid."  Taken to its logical conclusion, petitioner's argument might suggest that the transactions or entities in question should be collapsed or disregarded and viewed, in substance, as signifying nothing more than petitioner's attempt to garner tax deductions by renting his airplanes to himself.  But because respondent has not pursued this precise argument, neither do we.

[24]We note that this holding will result in a smaller increase to petitioner's taxable income with respect to this item than respondent determined in the notice of deficiency, which disallowed petitioner's Schedule C DEL deductions entirely for failure to establish that any amounts had been paid or incurred for ordinary and necessary expenses.  In this proceeding, respondent concedes that the DEL expenses were paid or incurred and has not argued that the DEL expenses were not ordinary and necessary.  Rather, respondent has sought only to limit the DEL

(continued...)

### 3. DPM's Rental Activity

For 2003 and 2004 petitioner reported the DPM rental losses as passive, and respondent has conceded any adjustment with respect to these items for these years. Respondent continues to challenge, however, petitioner's treating the 2002 DPM rental losses as nonpassive. Respondent contends that the 2002 DPM rental activity was per se passive under section 469(c)(2) and (4). Petitioner disagrees, contending that, at least for 2002 (the only year for which petitioner reported the DPM rental activity as nonpassive), DPM's rental activity was incidental to its primary activity of holding investment properties for future appreciation.[25] We need not decide whether DPM's rental activity

---

[24](...continued)
deductions on the grounds that they represent passive activity losses under sec. 469 and, alternatively, that the DEL activity was an "activity not engaged in for profit" within the meaning of sec. 183(c). If respondent's alternative sec. 183 contention were sustained, the result would be to limit petitioner's DEL deductions to DEL's gross income for each year at issue. See sec. 183(a) and (b). As discussed in more detail infra, in petitioner's circumstances this result is functionally equivalent to applying the sec. 469 restrictions to petitioner's DEL losses. Consequently, we need not and do not address respondent's alternative sec. 183 contentions.

[25]Under temporary regulations, an activity involving the use of tangible property is not treated as a rental activity for a taxable year if rental of the property is treated as incidental to a nonrental activity. Sec. 1.469-1T(e)(3)(ii)(D), Temporary Income Tax Regs., 53 Fed. Reg. 5702 (Feb. 25, 1988). Rental of property is treated as incidental to an activity of holding the property for investment only if the principal purpose of holding the property is to realize gain from the appreciation of the property and the gross rental income from the property is less than 2 percent of the lesser of (i) the unadjusted basis of the
(continued...)

was "incidental", because even if it were, to avoid the section 469 restrictions petitioner would still need to show that he materially participated in this activity. As discussed below, petitioner has not shown that he materially participated in any of the DPM activities (or for that matter, the DEL activities) for any year, whether they be considered singly or together.

4. Lack of Material Participation

Material participation is defined generally as regular, continuous, and substantial involvement in the business operations. Sec. 469(h)(1). The regulations identify these seven situations in which an individual will be treated as materially participating in an activity:

(1) The individual participates in the activity for more than 500 hours during such year;

(2) The individual's participation in the activity for the taxable year constitutes substantially all of the participation in such activity of all individuals (including individuals who are not owners of interests in the activity) for such year;

(3) The individual participates in the activity for more than 100 hours during the taxable year, and such individual's participation in the activity for the taxable year is not less than the participation in the activity of any other individual (including individuals who are not owners of interests in the activity) for such year;

(4) The activity is a significant participation activity (within the meaning of paragraph (c) of this section) for the taxable year, and the individual's

_____

[25](...continued)
property, or (ii) the fair market value of the property. Sec. 1.469-1T(e)(3)(vi)(B)(2), Temporary Income Tax Regs., 53 Fed. Reg. 5703 (Feb. 25, 1988).

aggregate participation in all significant participation activities during such year exceeds 500 hours;

(5) The individual materially participated in the activity (determined without regard to this paragraph (a)(5)) for any five taxable years (whether or not consecutive) during the ten taxable years that immediately precede the taxable year;

(6) The activity is a personal service activity (within the meaning of paragraph (d) of this section), and the individual materially participated in the activity for any three taxable years (whether or not consecutive) preceding the taxable year; or

(7) Based on all of the facts and circumstances (taking into account the rules in paragraph (b) of this section), the individual participates in the activity on a regular, continuous, and substantial basis during such year.

[Sec. 1.469-5T(a), Temporary Income Tax Regs., 53 Fed. Reg. 5725-5726 (Feb. 25, 1988).]

The regulations also provide that the last-described "facts and circumstances" test requires that the individual's participation in the activity exceed 100 hours during the taxable year.[26] Sec. 1.469-5T(b)(2)(iii), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988).

On brief petitioner claims that he meets the third, fourth, sixth, and seventh of these tests. He has directed us, however, to no evidence or proposed findings to show that he meets the

---

[26]Although the regulations permit a taxpayer to establish the extent of his participation by "any reasonable means", sec. 1.469-5T(f)(4), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988), a postevent "ballpark guesstimate" does not suffice, see Lee v. Commissioner, T.C. Memo. 2006-193; Bailey v. Commissioner, T.C. Memo. 2001-296; Carlstedt v. Commissioner, T.C. Memo. 1997-331; Speer v. Commissioner, T.C. Memo. 1996-323; Goshorn v. Commissioner, T.C. Memo. 1993-578.

quantitative requirements for the third, fourth, or seventh test, as applied to his activities separately. Petitioner's reliance on all four tests appears to be partly or (in the case of the sixth test) wholly premised on the notion that all his activities should be grouped together so as to constitute, in the aggregate, a personal service activity. For the reasons discussed above, we reject this premise.

D. Summary of Conclusions

We conclude and hold that petitioner's DEL and DPM activities were passive. Consequently, pursuant to section 469(d), for each year at issue he may not deduct losses from these passive activities to the extent that his aggregate losses from all his passive activities exceed his aggregate income from these activities. Application of this rule in calculating petitioner's tax liability requires some consideration of the interplay among petitioner's various activities in the light of our holdings.

For each year at issue, petitioner engaged in three passive activities: (1) The DPM nonrental activity; (2) the DPM rental activity; and (3) the DEL activity. We have disallowed the DPM nonrental losses for failure to show that the disputed expenses were ordinary and necessary. Consequently, petitioner is allowed no loss, passive or otherwise, with respect to the DPM nonrental activity. For 2002 and 2003 petitioner reported no income from

the DPM nonrental activity.  For 2004, however, petitioner reported $15,000 of income from the DPM nonrental activity; pursuant to our earlier holding, petitioner is allowed no deductions against this income.  For 2004, then, the result of our holding DPM's nonrental activity to be passive is partly to "free up" $15,000 of passive income to be added to petitioner's aggregate income from all passive activities and thereby to increase by $15,000 the aggregate losses petitioner is allowed to claim with respect to all his passive activities for 2004.[27]

## V.   Accuracy-Related Penalties

Respondent determined that for each year at issue petitioner is liable for an accuracy-related penalty pursuant to section 6662(a) and (b)(2) for substantial understatement of income tax.  Respondent bears the burden of production with respect this

---

[27]As previously noted, we have declined to address respondent's alternative argument under sec. 183 that petitioner's DEL activity was not engaged in for profit.  Our reason for declining to address this alternative argument was that, even if it were sustained, it would not affect petitioner's tax liabilities in any way different from our holding that the DEL losses were subject to the sec. 469 restrictions.  In the light of the discussion supra, that conclusion requires some further elaboration.  If we had held that the DEL losses were subject to the sec. 183 limitation, those losses would have been allowable only to the extent of DEL's gross income for each year and consequently would not have been available to absorb the $15,000 of "freed up" passive income from the DPM nonrental activity in 2004.  But because the DPM rental activity generated more than $15,000 of losses in excess of income from that activity, those losses are available to offset the $15,000 of "freed up" passive income from the DPM nonrental activity, independent of any effect that our treatment of the DEL losses, as being limited by either sec. 183 or 469, might have upon the calculation.

penalty.  Sec. 7491(c).  To meet this burden, respondent must produce evidence establishing that it is appropriate to impose this penalty.  Once respondent has done so, the burden of proof is upon petitioner.  See Higbee v. Commissioner, 116 T.C. at 449.

Section 6662(a) and (b)(2) imposes a 20-percent accuracy-related penalty on any portion of a tax underpayment that is attributable to any substantial understatement of income tax, defined in section 6662(d)(1)(A) as an understatement that exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000.  The exact amount of petitioner's understatement will depend upon the Rule 155 computation, taking into account respondent's concessions and in accordance with our findings and conclusions.  To the extent that those computations establish, as seems almost certain, that petitioner has a substantial understatement of income tax, respondent has met his burden of production.  See Prince v. Commissioner, T.C. Memo. 2003-247.

The accuracy-related penalty does not apply with respect to any portion of the underpayment if it is shown that the taxpayer had reasonable cause and acted in good faith.  Sec. 6664(c)(1).  Petitioner contends that he had reasonable cause and acted in good faith because in reporting his taxes for the years at issue he relied in good faith on advice from the Meiners firm, which prepared DPM's Forms 1120S and numerous schedules and tables that

were incorporated into petitioner's Forms 1040.  He also contends that he relied upon Advocate, which advised him in forming DEL and DPM and in preparing necessary documents.

Reliance on a professional tax adviser's advice may demonstrate reasonable cause and good faith if, taking into account all the facts and circumstances, the reliance was reasonable and the taxpayer acted in good faith.  Sec. 1.6664-4(b)(1), (c)(1), Income Tax Regs.  Reliance on a tax adviser may be reasonable and in good faith if the taxpayer establishes:  (1) The adviser was a competent professional with sufficient expertise to justify reliance; (2) the taxpayer provided necessary and accurate information; and (3) the taxpayer actually relied in good faith on the adviser's judgment.  Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 99 (2000), affd. 299 F.3d 221 (3d Cir. 2002).  The advice must not be based on unreasonable factual or legal assumptions and must not unreasonably rely on representations, statements, findings, or agreements of the taxpayer or any other person.  Sec. 1.6664-4(c)(1)(ii), Income Tax Regs.

Our determinations regarding petitioner's tax deficiencies turn on two key issues:  (1) Whether DPM's nonrental expenses were ordinary and necessary expenses; and (2) whether his DPM and DEL activities were passive activities.  Petitioner has not shown that he provided his tax advisers necessary and accurate

information as to certain critical matters regarding these issues. Moreover, it appears that his advisers unreasonably relied on certain of his representations.

More particularly, the disputed airplane expenses, reported as ordinary and necessary expenses of DPM, emanate from the flight logs that petitioner maintained. Meiners testified that these flight logs were a "logbook format that we provide to our clients as an example of what they can use to meet the documentation requirements." It appears, however, that the Meiners firm accepted at face value petitioner's characterization of all his flights as business related.

Similarly, the evidence indicates that it was petitioner, not his tax advisers, who decided whether to characterize his activities as passive or nonpassive. Meiners testified: "The client would tell us whether or not it was passive or nonpassive. * * * We would have to ask the client. We would have no way of knowing without. * * * If the client told us it was passive, fine. It was passive. If the client tells us -- you know, we don't know unless the client tells us." Judging from this testimony, it appears that on this critical issue the tax advisers relied upon petitioner, rather than the other way around.

As petitioner acknowledges on brief, he is "highly educated and sophisticated and possesses extensive business experience."

Accordingly, as petitioner concedes, "the standard of care that must have been exercised by the Petitioner is a high one."  We are not convinced that petitioner met that high standard of care. We hold that for each year at issue petitioner is liable for a section 6662(a) penalty insofar as the Rule 155 calculations show a substantial understatement of income tax.

To reflect the foregoing and respondent's concessions,

<u>Decision will be entered under Rule 155</u>.

APPENDIX A

DPM Nonrental Loss Deductions

|                          | 2002     | 2003      | 2004      |
|--------------------------|----------|-----------|-----------|
| Repairs & maintenance    | --       | $22,506   | $54,591   |
| Rent expense             | $54,400  | 27,607    | 32,058    |
| Taxes & licenses         | 600      | 25        | 125       |
| Depreciation             | --       | 1,056     | 1,353     |
|                          |          |           |           |
| Other deductions:        |          |           |           |
| Auto & truck expense     | 2,038    | 3,075     | 3,075     |
| Avionics                 | 2,630    | --        | --        |
| Fuel                     | 57,567   | 55,210    | 53,143    |
| Landing fees permits     | 3,092    | --        | --        |
| Maintenance Aircraft     | 30,575   | --        | --        |
| Real estate fees         | 160      | --        | --        |
| Training                 | 22,850   | 1,724     | 1,794     |
| Charts & maps            | --       | 279       | 81        |
| Dues & subscriptions     | --       | 1,045     | --        |
| Flight planning fees     | --       | 162       | --        |
| Hanger rent              | --       | 6,000     | --        |
| Insurance                | --       | 24,310    | 20,910    |
| Legal & professional     | --       | 375       | 1,300     |
| Management fees          | --       | 1,800     | 1,800     |
| Meals & entertainment    | --       | 526       | 261       |
| Miscellaneous            | --       | 488       | 430       |
| Oil                      | --       | 58        | --        |
| Other rent               | --       | 213       | --        |
| Ramp & landing fees      | --       | 179       | 106       |
| Postage                  | --       | --        | 339       |
| Supplies                 | --       | 46        | 1,307     |
| Telephone                | --       | 788       | 725       |
| Tie down parking         | --       | 543       | 770       |
| Transportation           | --       | 200       | 200       |
| Travel                   | --       | 2,263     | 1,134     |
| Total                    | 173,912  | 150,478   | 175,502   |

APPENDIX B

DPM Rental Loss Deductions

|                        |   2002 |   2003 |    2004 |
|------------------------|-------:|-------:|--------:|
| Advertising            |   $196 |     -- |      -- |
| Auto & travel          |  1,414 |   $319 |      -- |
| Cleaning & maintenance |    692 |     -- |      -- |
| Commissions            |    261 |  4,858 |      -- |
| Insurance              |  4,027 |  1,773 |  $1,965 |
| Interest               |  4,578 | 21,837 |  66,883 |
| Repairs                |     -- |  1,118 |   6,082 |
| Taxes                  |  1,382 | 14,863 |  13,529 |
| Utilities              |    503 |  1,183 |   2,087 |
| Depreciation           | 20,829 | 33,685 |  67,228 |
| Other deductions       |  6,602 | 14,509 |  13,367 |
| Total                  | 40,484 | 94,145 | 171,141 |